*In re* VIGENCIA DE LIMITACIONES CONSTITUCIONALES Y ÉTICAS APLICABLES A LOS MIEMBROS DE LA JUDICATURA PUERTORRIQUEÑA ANTE EL REFERÉNDUM DE ENMIENDAS CONSTITUCIONALES DE 6 DE NOVIEMBRE DE 1994.

*Número:* MC-94-21      *Resuelto:* 4 de agosto de 1994

*Ángel Díaz Vanga, pro se,* y *Eduardo Sosa Cartagena, pro se,* promoventes de la petición; *Pedro A. Delgado Hernández, Procurador General,* abogado el El Pueblo.

## RESOLUCIÓN

Resolvemos los dos (2) asuntos presentados a este Tribunal de forma conjunta en el caso de epígrafe.

Primero, a la solicitud de que emitamos una resolución para prohibir a todos los jueces del país que participen directa o indirectamente en actividades a favor o en contra de la enmienda constitucional propuesta en el Referéndum de 6 de noviembre de 1994 sobre cómo se determinará el número de integrantes del Tribunal Supremo, NO HA LUGAR.

Segundo, a la querella que fue presentada contra el Juez Pierre Vivoni, por alegadamente participar de manera activa en el debate público respecto a la enmienda constitucional propuesta antes aludida, ARCHÍVESE POR INMERITORIA.

(1) Tanto la disposición constitucional como la del Canon XIII de Ética Judicial, 4 L.P.R.A. Ap. IV-A, que prohíben *la participación de jueces en campañas políticas,* se refieren a la intervención de éstos en la promoción de candidaturas a cargos electivos, a su colaboración con el proselitismo partidista y otras actividades de naturaleza similar. De ningún modo vedan la expresión pública de los jueces sobre sus propias ideas acerca de los asuntos que atañen a la Rama Judicial cuando se hace en foros idóneos que no sean actos, reuniones o asambleas de carácter político-partidista.

(2) Todos los jueces del país tienen el deber de defender

y promover la independencia del Poder Judicial, como elemento esencial de nuestro sistema de vida democrático. El ejercicio de su libertad de expresión, en cumplimiento de ese deber de su cargo, está protegido cabalmente tanto por la Constitución de Estados Unidos y la del Estado Libre Asociado de Puerto Rico como por los Cánones de Ética Judicial y por el Código de Ética Profesional que rige a los abogados de Puerto Rico.

(3) La situación ahora ante nos no es totalmente nueva. En otras ocasiones ya habíamos intimado la normativa que estamos reiterando en esta resolución. El principio constitucional de independencia judicial es inmanente a la función misma de administrar la justicia. No se trata de un asunto de naturaleza político-partidista. Por ello, no puede estar vedado que los jueces diluciden públicamente dicho principio. El hecho de que alguna manifestación de un juez, en defensa de la independencia judicial, coincida con una controversia pública con matices políticos no deslegitimiza tal manifestación. *In re Solicitud Cepeda García*, 130 D.P.R. 18 (1992); *Retiro Del Hon. Víctor M. Pons Núñez*, 129 D.P.R. 931 (1992); *Convoc. Sesión Especial Conf. Judicial*, 120 D.P.R. 838 (1988).

*Publíquese.*

Lo acordó el Tribunal y certifica el señor Secretario General. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Hasta hoy la figura del *Juez-Político* era extraña a nuestra Judicatura y sistema democrático. Por ello, suscri-

bimos este disenso con dolor y tristeza al contemplar cómo la mayoría del Tribunal, en una acción sin precedentes,[1] permite a los jueces del país involucrarse oficialmente en una campaña político-partidista contra la enmienda constitucional propuesta que pretende aumentar a nueve (9) los miembros de este Foro y eliminar su prerrogativa exclusiva para proponer variaciones a su composición.

Ese curso de acción destruye la esencia en que se apuntala la razón de ser de nuestro sistema constitucional de un Gobierno de leyes, no de hombres, y pone en jaque la capacidad y neutralidad que presupone el Poder Judicial. Una vez más el poder de la mayoría del Tribunal vence, pero no convence; ha creado artificialmente unas zonas "ajurídicas", al margen de la Constitución, de la Ética y de la mejor tradición judicial.

# I

*Prohibiciones constitucionales y éticas*

Sin exclusiones, la Sec. 12 del Art. V de nuestra Constitución,[2] los Cánones de Ética y la más excelsa y honorable tradición judicial prohíben a *todo juez*, "directa o indirectamente", fomentar, participar e involucrarse en campaña, proceso o asunto político "de clase alguna".

Se advierte y comprende el carácter absoluto del mandato constitucional. La política partidista no cabe en los

---

[1] De entrada, adelantamos que no cabe invocar como precedente judicial análogo a *In re Solicitud Cepeda García*, 130 D.P.R. 18 (1992); menos aprisionarnos en nuestros pronunciamientos. ¿Cómo comparar una crítica aislada al Primer Ejecutivo con una campaña oficial proselitista de la Rama Judicial contra una enmienda constitucional que ha de someterse al electorado del país?

[2] Dispone:

"*Ningún juez* aportará dinero, en forma directa o indirecta, a organizaciones o partidos políticos, ni desempeñará cargos en la dirección de los mismos o *participará en campañas políticas de clase alguna*, ni podrá postularse para un cargo público electivo a menos que haya renunciado al de juez por lo menos seis meses antes de su nominación." (Énfasis suplido.) Art. V, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 361.

tribunales; menos que la hagan los jueces. Al permitirlo se rompe el hilo conductor que animó a la Asamblea Constituyente a "establecer firmemente la independencia judicial ... [y] librar al juez de toda influencia política indeseable". 4 Diario de Sesiones de la Asamblea Constituyente 2614 (1951).

Precisamente, para seguir el espíritu de nuestra Ley Fundamental y para darle un imprimátur de mayor solidez y despejar cualquier duda, aprobamos el Canon XIII de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

Los jueces deben proteger y promover la independencia del poder judicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática. *A tal fin, el Juez debe abstenerse de participar en el proceso político*, sin menoscabo, desde luego, de su derecho al sufragio, a sus propias ideas sobre cuestiones políticas, y a los deberes y funciones que le fijan las leyes y reglamentos electorales.

*Sin que la siguiente enumeración excluya otras actividades que por su carácter político le están vedadas*, el Juez no debe:

(a) *Participar en campañas políticas de clase alguna.*

(b) Ocupar cargos en organismos o partidos políticos.

(c) Aportar dinero, en forma directa o indirecta, a candidatos, organismos o partidos políticos.

(d) Participar en reuniones, tertulias, asambleas, convenciones, primarias u otros actos de carácter político-partidista.

(e) Endosar candidatos para posiciones electivas o de nombramiento gubernamental o líderes políticos.

(f) *Hacer expresiones, comentarios o manifestaciones públicas sobre asuntos o actos de naturaleza política o partidista.*

(g) Mantener relaciones estrechas que lo identifiquen con figuras o líderes políticos.

(h) Participar en reuniones con funcionarios gubernamentales sobre asuntos que guardan estrecha relación con cuestiones políticas.

(i) *Atacar públicamente o entablar polémicas con candidatos o líderes políticos*, sin menoscabo, desde luego, de su derecho a defenderse de ataques abusivos a su persona o a su honra.

(j) *Fomentar los intereses de organismos o partido político alguno.*

*El Juez debe estar y sentirse exento de toda influencia política y no debe dar base con su conducta para la creencia de que sus ideas políticas influyen en el cumplimiento de sus funciones judiciales.* (Énfasis suplido.)

Al comentar este canon en nuestra opinión concurrente en *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 99–101 (1980), expresamos:

> De este texto se pueden derivar varias observaciones. *Primero*, la adherencia a estas reglas éticas exige reconocer que la conducta subjetivizada se *estigmatiza al exteriorizar una particular mentalidad ideológica.* En *segundo* lugar, se pone de manifiesto el principio rector en los Cánones de Ética Judicial, de que *un juez no puede hacer indirectamente, o mediante grupo, lo que directa o individualmente le está éticamente vedado.* En otras palabras, toda prohibición ética no sólo veda la acción de tipo personal, sino de cualquiera otra índole si se origina a base de presiones o influencias del ente judicial, aunque el vehículo institucional, medio, foro o agente materializador, sea distinto. *Tercero*, el pilar y requisito *sine qua non* para todo reclamo de independencia judicial es el principio denominado "neutralidad de la magistratura", concepto acuñado por Castán, quien con referencia a su importante vertiente de neutralidad *política* nos dice:
>
> > "El Juez, naturalmente, tiene deberes hacia su Patria y ha de tener convicciones políticas como cualquier ciudadano. Mas por muy afecto que sea a una ideología política, debe en el ejercicio de su función judicial hacer justicia y no servicios." *Poder Judicial e Independencia Judicial*, Ed. Reus, 1951, pág. 49.
>
> *Cuarto*, la natural y necesaria inhibición consagrada en la Constitución y las limitaciones éticas dimanantes del cargo judicial existen sin perjuicio del ejercicio al sufragio y de tener y mantener creencias o ideas políticas o ideológicas en lo más íntimo de la conciencia. Aclaramos que lo que para algunos se reduce a un problema de invocar el derecho a una irrestricta libre expresión, para nosotros es un asunto de ética, prudencia y moderación. *Quinto*, no es suficiente proclamar que en la práctica somos rectos e imparciales. Es esencial que tal rectitud e imparcialidad se manifiesten continuamente en todos los actos del Juez en abono de la confianza y fe pública. *"El Juez no solamente ha de ser imparcial, sino que su conducta ha de excluir toda posible apariencia* de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias." Canon XI de Ética. (Bastardillas nuestras.) Esa norma y el dogma de legali-

dad constituyen el único control reductor de la actividad judicial. (Énfasis en el original y escolio omitido.)

## II

*Carácter político-partidista de las enmiendas propuestas en el Referéndum*

Innegablemente las enmiendas propuestas a la Constitución que han de someterse en el Referéndum de 6 de noviembre de 1994 —condicionar el derecho a la fianza, limitar los términos de ciertos cargos electivos y el número y forma de variar la composición de este Tribunal— son asuntos claramente político-partidistas. Basta un breve repaso a los debates de la Asamblea Constituyente, a las actuales posiciones de los partidos políticos —Partido Nuevo Progresista (P.N.P.), Partido Popular Democrático (P.P.D.) y Partido Independentista Puertorriqueño (P.I.P.)— y a las manifestaciones de sus líderes, para así confirmarlo. Más aún, este Tribunal, precisamente en *Ortiz Angleró v. Barreto Pérez*, supra, por voz del entonces Juez Presidente Señor Trías Monge, indicó sin titubeos que la enmienda a la Constitución para limitar el derecho a la fianza era "una controversia de índole política sobre la que este Tribunal no puede pronunciarse". Íd., pág. 86.

De igual naturaleza político-partidista son las enmiendas para restringir el término de ciertos cargos electivos y la referente a variar la composición de este Tribunal. *Primero*, resalta a la vista que la potestad soberana reside en El Pueblo, que ha otorgado prerrogativas gubernamentales a los Poderes Ejecutivo, Legislativo y Judicial; no sólo a uno (1) o a dos (2). En cuanto al Poder Judicial, hay un mandato constitucional expreso de que los jueces no se involucrarán directa o indirectamente en campañas políticas de clase alguna. *Segundo*, la decisión de los electores el 6 de noviembre sobre la enmienda referente a este Tribunal *es política*. Serán ellos quienes, a la luz de las campañas y

propagandas de los partidos políticos, votarán a favor o en contra. Es *política* porque se refiere a cómo se organizará uno (1) de los tres (3) poderes del Estado, esto es, el número de Jueces de este Foro y la manera en que sus integrantes serán variados; es *política* porque pone en ejecución una determinación válida de los Poderes Ejecutivo y Legislativo; es *política* porque una convocatoria a referéndum es una decisión de esos dos (2) poderes que la propia Constitución autoriza como medio para plantearle al pueblo la necesidad de ciertas modificaciones; es *política*, por último, por definición propia de la Ley Electoral de Puerto Rico —Ley Núm. 4 de 20 de diciembre de 1977, según enmendada, 16 L.P.R.A. sec. 3001 *et seq.*— a los efectos de que un Referéndum[3] no es otra cosa que una *elección* mediante la cual se le consulta al electorado la aprobación o rechazo de uno o varios asuntos. 16 L.P.R.A. sec. 3003(15) y (50).

Ossorio nos dice que la política es "[a]rte, doctrina u

---

[3] En nuestra opinión disidente emitida en *Gierbolini Rodríguez v. Gobernador*, 129 D.P.R. 402, 414–415 (1991), expresamos así el significado y las modalidades claramente político-partidistas, de todo referéndum:

"La palabra *referéndum* viene del latín *referre*, esto es, referir. 'Expresa Posada, en su obra *El Sufragio*, que hoy se llama *referéndum* a la "función del sufragio por virtud de la cual éste interviene en la adopción definitiva de las leyes, ejercitando como una especie de prerrogativa de veto y de sanción, análoga en su alcance a la que es corriente atribuir a los monarcas constitucionales". Por el *referéndum* interviene el pueblo en forma directa en el régimen político estatal; participa, de cierta manera, en la sanción de las leyes y decide en última instancia las resoluciones que le afectan en forma directa. Por el *referéndum*, en realidad, se ejerce una democracia pura, genuina; ya que, al someterse directamente las leyes al voto del pueblo, éste decide participando sin intermediarios o representantes en la elaboración de las normas que han de ser obligatorias.' G. Cabanellas, *Diccionario Enciclopédico de Derecho Usual*, 20ma ed., Buenos Aires, Ed. Heliasta, 1981, T. VII, pág. 77.

"Sobre sus modalidades y clases se hacen varias distinciones. 'El referéndum puede ser "constitucional" o "legislativo", según que recaiga sobre decisiones correspondientes a la órbita del *poder constituyente* o *del poder constituido*, *respectivamente*. Cabe distinguir luego entre referéndum "consultivo" *o "ante legem"*, y de *"ratificación"* o *"post-legem"*, si se atiende a la oportunidad en que se lleva a cabo. Finalmente, en cuanto a su alcance o extensión, la consulta popular puede ser de naturaleza "obligatoria" o simplemente "facultativa".'... M. Padilla, *El referéndum ¿técnica necesaria de participación política?*, 1978-C Rev. Jur. Arg. La Ley 925 (1978). Véanse: L. Sánchez Agesta, *Principios de Teoría Política*, 5ta ed., Madrid, Editora Nacional, 1974, pág. 290; J.A. Garrone, *Diccionario Jurídico Abeledo-Perrot*, Buenos Aires, Ed. Abeledo-Perrot, 1988, T. III, pág. 263; M. Ossorio, *Diccionario de ciencias jurídicas políticas y sociales*, Buenos Aires, Ed. Heliasta, 1984, pág. 650."

opinión referente al gobierno de los Estados. Actividad de los que rigen o aspiran a regir los asuntos públicos". M. Ossorio y Florit, *Diccionario de ciencias jurídicas, políticas y sociales*, Buenos Aires, Ed. Heliasta, 1984, pág. 587. Y *campaña electoral* ha sido definida como "[c]onjunto de las operaciones de propaganda que preceden a una elección o referéndum". R. Guillien y J. Vincent, *Diccionario Jurídico*, Bogotá, Ed. Temis, 1986, pág. 54.

## III

*Antecedentes fácticos inmediatos*

Conforme surge de la petición presentada bajo juramento por los electores Ángel D. Díaz Vanga y Eduardo Sosa Cartagena, que fue corroborado por sus anejos

> ... [d]espués de la aprobación de las Resoluciones de la Legislatura sobre las enmiendas constitucionales, y comenzando ya el debate y campaña político partidista a título individual y representativo un Juez Superior, Hon. Pierre Vivoni, impermisiblemente, en violación de lo dispuesto en la Constitución de Puerto Rico, y de los Cánones de Etica Judicial, y contrario a la mejor tradición de la Judicatura Puertorriqueña, ha comenzado una campaña en prensa, radio y televisión, y otros foros, promoviendo su posición (no sólo individual sino a nombre de los demás Jueces miembros de la Asociación Puertorriqueña de la Judicatura) *en contra* de que el Pueblo de Puerto Rico fije en nueve (9) el número de Jueces de este Honorable Tribunal Supremo; posición que coincide en este extremo con la asumida y auspiciada por el P.P.D. y el P.I.P. (Véanse Anejos del Exhibit I). La violación constitucional, ética y judicial del Hon. Juez Pierre Vivoni ha llegado al extremo de, en actitud política partidista beligerante, retar al Hon. Gobernador Pedro Rosselló a debatir sobre las enmiendas constitucionales.
>
> Como si ello fuera poco, esta semana —miércoles, 27 de julio de 1994— la Hon. Directora de la Administración de los Tribunales, Lcda. Mercedes Marrero de Bauermeister, ayudante constitucional del Hon. Juez Presidente de este Honorable Tribunal (Artículo V, Sección 7 de la Constitución), anunció que se propone llevar a cabo una campaña "educativa" *en contra* de la

propuesta enmienda para que el pueblo fije en nueve (9) el número de Jueces de este Honorable Tribunal. (Véase, Anejo 20 del Exhibit I). Nos preguntamos: ¿Está ella autorizada por el Hon. Juez Presidente para esa inaudita actuación? ¿Es permisible ello constitucionalmente y éticamente? Con todo respeto, es un eufemismo de marca mayor de parte de la Hon. Directora pretender circunvalar las prohibiciones constitucionales y éticas a título de "campaña educativa".

Los hechos antes expuestos plantean no sólo para todos los Jueces del País (miembros o no de la Asociación Puertorriqueña de la Judicatura) la incógnita de si en Puerto Rico rigen todavía los principios constitucionales y éticos que les prohíben iniciar campaña a favor o en contra de las propuestas enmiendas constitucionales, por disponerlo así el Artículo V, Sección 12 de la Constitución de Puerto Rico y los Cánones de Etica Judicial. Ante esta situación, ¿pued[e] un grupo de Jueces agruparse para iniciar una amplia campaña promoviendo el voto en la afirmativa de las tres propuestas enmiendas constitucionales? ¿Puede el Hon. Juez Presidente de este Honorable Tribunal permitir que el Juez Superior, Hon. Pierre Vivoni, realice esta campaña política, con su consentimiento, como ha alegado esta semana el propio Hon. Juez Vivoni? (Véase Anejo 1 del Exhibit I). ¿Pueden otros Jueces agruparse para hacer campaña en contra de todas o algunas de las propuestas enmiendas constitucionales? ¿Puede la Directora de la Administración de los Tribunales (ayudante constitucional del Juez Presidente de este Honorable Tribunal), con los fondos y personal de esa oficina, y con el cargo que ostenta, iniciar una campaña en contra de una de las propuestas enmiendas constitucionales del Referéndum del 6 de noviembre de 1994?

Estas interrogantes revelan la gravedad y el potencial de que la Judicatura Puertorriqueña sea lanzada al ruedo político partidista, destruyéndose así la esencia de su neutralidad, imparcialidad y objetividad.

Es inconcebible ese desenlace. Es obvio que se amerita urgentemente un pronunciamiento cautelar, vía Resolución por este Honorable Tribunal Supremo que reitere las limitaciones y prohibiciones constitucionales y éticas respecto a la participación de los Jueces en el proceso previo y Referéndum del 6 de noviembre de 1994. Ello sería a tenor con pronunciamientos previos de este Honorable Tribunal como los de las Resoluciones de este Honorable Tribunal Supremo de 6 de diciembre de 1974, 102 D.P.R. 1031 (1974); y de 10 de marzo de 1988, 120 D.P.R. 690 (1988). (Escolio omitido.) Petición, págs. 3–5.

# IV

*Carácter político-partidista de la campaña oficial por Jueces-Políticos*

Ni la Constitución ni los Cánones de Ética Judicial visualizan excepciones a la prohibición de que los jueces se involucren pública y activamente en una campaña de ribetes político-partidistas, fundadas en que la enmienda constitucional que ha de someterse al electorado trate sobre alguna disposición del Art. V de nuestra Constitución, *supra*, o que el Juez Presidente o este Tribunal unánimemente estén en contra.

Rechazamos el ingenioso argumento que intenta validar un patrón de implicación repetido y continuo de la Judicatura puertorriqueña, bajo el manto de que simplemente se trata de una campaña educativa de carácter informativo cívico, según han expuesto públicamente el Juez Superior Hon. Pierre Vivoni y la Directora de la Oficina de Administración de los Tribunales, Lcda. Mercedes M. Bauermeister. Es ilusorio pensar que esa "educación" por *Jueces-Políticos* pueda lograrse adelantando un solo punto de vista; ello es contrario a los principios pedagógicos elementales.([4]) Ni el Juez Presidente, como tampoco ningún miembro de este Tribunal —con carácter institucional o individual— puede así autorizarlo o establecer dispensas vía regla o interpretación.

El apéndice, que unimos a esta ponencia, refleja que no estamos ante una instancia aislada en la cual un juez expone una crítica pública a alguna actuación ejecutiva o le-

---

([4]) "La educación y la política son *inseparables,* aunque no idénticas. Son *inseparables* porque todo lo que se enseña —hasta las doctrinas en física o biología (por ejemplo, Darwinismo)— puede tener consecuencias políticas, formando opiniones de quienes gobiernan o van a gobernar; y porque lo que debe enseñarse es por lo tanto asunto eminentemente político. Son *inseparables,* también, porque los discursos y acciones políticos instruyen a los ciudadanos —viejos o jóvenes— lo mismo que a los no ciudadanos." (Traducción nuestra.) C.R. Kesler, *Education and Politics: Lessons from the American Founding,* The University of Chicago Legal Forum, Vol. 1991, pág. 101.

gislativa, sino frente a un plan concertado de campaña proselitista, que se hace oficial con la resolución del Tribunal. Ahora, bajo esta nueva visión ética los jueces podrán exponer en la prensa, radio, televisión, reuniones, tertulias, debates, asambleas, asociaciones y clubes cívicos —incluso dentro de las facilidades físicas que albergan los tribunales— la *postura oficial* mayoritaria que, bajo el predicado de "deber", les exhorta de forma implícita a comunicar a los electores del país que voten *contra* la enmienda a la composición del Tribunal; ello de acuerdo con los argumentos expuestos en el Mensaje de 19 de julio de 1994 del Juez Presidente Señor Andréu García,[5] remitido el 22 de julio a *todos* los Jueces del Circuito de Apelaciones y del Tribunal de Primera Instancia por la Directora de la Oficina de Administración de Tribunales, licenciada Bauermeister, como "ilustrativo de la posición de la Rama Judicial". Anejo B, pág. 1. *¿Qué clase de educación cívica-informativa es aquella que sólo expone un (1) punto de vista: en contra?*

Esta implicación destruye la esencia del *Poder Judicial* y el factor de neutralidad en la cual se apuntala todo reclamo de independencia, elemento indispensable para que se respeten los dictámenes de los jueces. Debilita irremediablemente la imagen de imparcialidad de este Tribunal, de los jueces del Circuito de Apelaciones y del Tribunal de Primera Instancia.

Lo expuesto queda agravado ante el anuncio del P.I.P. y del Senador del P.P.D., Lcdo. Eudaldo Báez Galib, en cuanto a que impugnarán en los tribunales la constitucionalidad del Referéndum. ¿Podemos reclamar imparcialidad y objetividad si la posición *oficial* del Tribunal Supremo y de la alta dirección administrativa es activamente contraria a una de las enmiendas propuestas en el Referéndum?

Involucrar a los jueces en esa contienda partidista exa-

---

(5) Ante la *Fundación Facultad de Derecho Eugenio María de Hostos* en Mayagüez.

cerba innecesariamente las naturales zonas de fricción existentes entre los poderes constitucionales. Una vez los jueces entren en la palestra pública política, no hay forma de evitar que sean blanco inexorable de los ataques y vejámenes personales que lamentablemente generan este tipo de controversias partidistas apasionadas.

## V

*Función no política del juez*

La resolución mayoritaria no es persuasiva. Desarrollar en el Poder Judicial una campaña oficial de carácter político-partidista y utilizar, como instrumentos, a los jueces para hacer una apología de la independencia judicial es un *contrasentido.* Lejos de avanzarla, la retrasa y anquilosa, a la vez que coloca a los jueces en una impermisible relación simbiótica de *Juez-Político* con las otras dos (2) ramas políticas.

> La perspectiva del político sobre las leyes que se implican en su actividad es siempre función de su posición particular en la lucha política.
> *La perspectiva del jurista es otra. El jurista como tal no interviene en la lucha política.* Y mira las leyes con espíritu sereno para valorarlas no con una medida relativa —cierta ideología— sino con un valor inmanente: la justicia. El jurista encuentra las leyes buenas o malas simplemente por su adecuación a la justicia. Y a la justicia, como a Dios, se puede llegar por caminos múltiples. *Por esto el jurista no puede clasificar los regímenes políticos ni las reglas de derecho que se desarrollan en su seno, con el mismo espíritu que el político.* (Énfasis suplido.) L.F. Martínez Ruiz, *El político, el jurista y las leyes*, 66 Rev. Jur. Cataluña 871, 873 (1967).

Tomamos nota de que los Cánones de Ética Judicial "son normas mínimas de comportamiento que todo Juez debe observar fielmente, tanto en su letra como en su espíritu, por ser consustanciales con el cargo judicial. *Estos Cánones no excluyen otras normas de conducta que también obligan*

*al Juez, que están establecidas por ley o que son inherentes al honor tradicional de la judicatura".* (Énfasis suplido.) Canon XXVI de Ética Judicial, 4 L.P.R.A. Ap. IV-A.

En virtud de ello, es deber de todo juez, en el ejercicio de su prudencia y sentido común, atemperar sus actuaciones al honor y a la dignidad del cargo que ostenta; en especial, su conducta pública.

La figura del *Juez-Político*, propagandista contrario a una propuesta de enmienda, es constitucionalmente extraña.

> No puede diversificarse la persona que a la vez es juez. El desempeño del cargo exige autolimitaciones que no se extienden a otras profesiones. La línea entre una opinión personal y cuando actúa como órgano judicial es muy tenue. Es casi imposible, por no decir ilusorio, deslindarla. Cuando se hace pública, se quiebra y desaparece. Así, la rúbrica judicial se proyecta en toda su extensión e intensidad en las opiniones de jueces a título personal y pueden sobrevenir malas interpretaciones y especulaciones. *Para los efectos señalados, un juez siempre es juez.* Esta unidad es concebida del siguiente modo:
> "El Juez no sólo está inserto en el mundo más estricto de su función, sino otro más amplio: el de la sociedad en general. Dentro de ésta, el juez, como cualquier otro, si bien distinto en su función, cumple y representa un papel. Para los otros, para los demás, él es el juez: *dentro y fuera del juzgado es el Juez. El carácter que imprime su función no le abandona* —salvo en la gran ciudad— *ya nunca,* excepto —*y no totalmente*— en el círculo estrecho de las amistades que pueda tener y conservar sin merma de su independencia, cosa difícil, pero posible." De la Vega Benayas, *Moral, estilo y función judicial,* citado por Martínez, *id.,* pág. 208. (Énfasis en el original.) *Ortiz Angleró v. Barreto Pérez,* supra, pág. 104.

## VI

### *Debilitamiento de la independencia judicial*

No estamos ante una instancia o crítica aislada al Poder Ejecutivo ante nombramientos de legisladores directamente al estrado judicial. *In re Solicitud Cepeda García,* 130 D.P.R. 18 (1992), voto de inhibición. Esa sola ocasión

dista mucho de compararse con el sello oficial mayoritario que el Tribunal le imprime a una campaña proselitista como ésta. Allí no se sometía al electorado ninguna enmienda constitucional. La resolución mayoritaria no puede justificarse a base de que es una defensa a la independencia judicial. Todo lo contrario, la campaña político-partidista oficial que utiliza jueces, recursos humanos y económicos, y las facilidades físicas de los tribunales debilita la independencia judicial, pues desvirtúa la imagen de rectitud e imparcialidad de la Judicatura y mina la confianza que le ha depositado la ciudadanía. En fin, convierte en mero espejismo la independencia judicial la cual debió cristalizarse y defenderse con una resolución inspirada en la ética del silencio; esto es, la más callada, prudente y discreta reflexión, sin que ello signifique que ha perdido el juez, por inercia y desidia, el baluarte de su independencia. Compárese *In re Participación Jueces*, 80 D.P.R. 784 (1958).

"La independencia individual del juez es el secreto de su dignidad y la clave de una independencia judicial unificada." *In re Conferencia Judicial*, 122 D.P.R. 420, 449 (1988), voto explicativo. Más que tema de mensaje, discurso o conferencia, es una vivencia espiritual[6] producto de una conciencia libre, sin ataduras políticas.

Sólo cuando el juez es independiente *la justicia queda servida por sí misma*. Ciertamente, si no es independiente,

---

[6] "... [L]a Independencia [judicial] tiene su raíz en un movimiento espiritual: podrá el cimiento económico ser condición casi indispensable para su ejercicio; podrán el vigor mental y la disciplina científica servir de eficaces coadyuvantes; pero, en definitiva, la independencia nace con el sentimiento de la propia valía y el convencimiento de la misión que se realiza; y una vez arraigados aquel sentimiento y esta convicción, el juzgador se da cuenta de la autoridad que posee, y sintiéndose ligado a una tradición secular y venerable, encuentra en todo ello la firme garantía de su falta de supeditación a toda clase de indicaciones y exigencias. La independencia, en suma, se logra siempre que el Poder Judicial tiene conciencia clara de su augusta función, *y cada vez que uno de los individuos que lo componen adquiera concepto preciso de que pertenece a aquel Poder, ha de estar a la altura que esto exige, no le es lícito transmitir mermado a su sucesor el depósito de prestigio que él recibiera y ha de arrastrar impasibles las consecuencias de sus actos ...*" (Énfasis suplido.) J. Estrada, citado por L. Martínez-Calcerrada, *Independencia de Poder Judicial*, Madrid, Ed. Rev. Der. Judicial, 1970, pág. 58 esc. 13.

podrá eventualmente servir a la justicia, pero la servirá por algo que no le pertenecía a la justicia misma, a saber: temor, interés, amor propio, gratitud, honores, publicidad, etc. Huelga decir que ese estado de cosas configura el supremo desmoronamiento de las garantías constitucionales y queda en jaque toda protección ciudadana. La Constitución sólo vive por la aplicación viril e imparcial de los jueces; si desfallecemos, deja de existir. (Énfasis en el original.) *In re Conferencia Judicial*, supra, págs. 458–459, opinión disidente.

El reclamo de independencia judicial no es una excusa para un relativismo ético e involucrar a los jueces en una campaña político-partidista. La mayoría ha transformado nuestra democracia en un Gobierno de sólo siete (7) jueces que, a título de "hegemonía de magistrados", decide desde este estrado la constitucionalidad y validez de las leyes y, sin despojarse las togas, decide también qué enmiendas deben hacerse al Poder Judicial; si no gustan, a modo equivalente y funcional de un *Partido del Magistrado*, autoriza la figura del *Juez-Político* para que haga campaña en *contra*, usando todo el prestigio, poder y coacción que genera el cargo judicial.

Los miembros del Poder Judicial si pretenden que se les respete su independencia, por los participantes en el crudo partidismo puertorriqueño, deben poner de su parte y evitar en todo lo posible dar señas de parcialidad y de deseos de entrar en la contienda político-partidista. H.N. Padilla Martínez, *El poder judicial en Puerto Rico, su estructura, funciones y limitaciones*, 50 Rev. Jur. U.P.R., 357, 382 (1981).

Nos hacemos eco de las siguientes expresiones del ex Juez Asociado Señor Carlos J. Irizarry Yunqué:

> *Toda persona tiene el derecho constitucional a participar activamente en los procesos políticos del país. A los jueces eso, les está vedado por el canon XIII, que limita sus derechos exclusivamente al ejercicio del sufragio y a tener sus propias ideas sobre cuestiones políticas. En otras palabras, el juez tiene liber-*

*tad para pensar, pero no para expresar lo que piensa en materia de política partidista.*

Uno de los más sagrados derechos del ser humano es el de asociarse o reunirse con quien quiera. El canon XIII, inciso (g), prohíbe a los jueces "mantener relaciones estrechas que lo identifiquen con figuras o líderes políticos". Y el inciso (h) les prohíbe "participar en reuniones con funcionarios gubernamentales sobre asuntos que guardan estrecha relación con cuestiones políticas".

*La función de un juez es tan delicada que, en el contexto de estas prohibiciones, es a veces un ser indefenso, privado hasta del derecho de libre expresión.* [H]emos tenido que callar, confiados en que, como el fénix, nuestra judicatura resurge siempre limpia.

... [R]edoblemos nuestros esfuerzos para que, siendo *humanos, podamos superar las flaquezas de esa condición natural y mediante el estudio aplicado de las normas de conducta que nos rigen, sigamos siendo, para honra de nuestro Pueblo, una judicatura ejemplar.* (Énfasis suplido.) Ponencia publicada en L.M. Negrón Portillo, *Ética y disciplina judicial en Puerto Rico*, San Juan, Ed. Luis Mariano Negrón, 1987, págs. 9–10.

## VII

*Efectos negativos sobre la pureza y el resultado del proceso electoral*

La resolución mayoritaria que permite y fomenta la continuación de la campaña oficial contra la enmienda constitucional a la composición de este Tribunal *vicia la pureza del proceso electoral y arroja dudas sobre la legitimidad de los resultados adversos de esa enmienda particular.* Nos explicamos.

El Art. 1.029 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3029, dispone que las Comisiones Locales de Elecciones —organismos administrativos cuasijudiciales de vital importancia— sean presididas por *un juez de primera instancia nombrado por el Juez Presidente de este Tribunal* e integradas por miembros pertenecientes al P.N.P., P.P.D. y P.I.P. Esa encomienda legislativa *responde a la confianza que tradicionalmente los poderes políticos,*

*los partidos, sus líderes y la ciudadanía en general han tenido en los jueces; claro está, bajo la premisa de que ellos no se inmiscuirán activamente en campañas políticas proselitistas.*

Según indicado, el P.P.D. y P.I.P. están en contra y harán campaña política para combatir la enmienda constitucional y variar la composición y facultad de este Tribunal Supremo. Esa misma campaña en *contra* es la que está *oficializando* la mayoría del Tribunal, y puesta en marcha mediante el antes aludido Memorando de la Directora de la Oficina de Administración de Tribunales, licenciada Bauermeister, a todos los jueces. Preocupa, además, que la resolución de hoy, en su segundo párrafo, se entienda que se exhorta —de manera implícita— a "todos los jueces del país" a unirse a esa campaña.

> No puede diversificarse la persona que a la vez es juez. El desempeño del cargo exige autolimitaciones que no se extienden a otras profesiones. La línea entre una opinión personal y cuando actúa como órgano judicial es muy tenue. Es casi imposible, por no decir ilusorio, deslindarla. Cuando se hace pública, se quiebra y desaparece. Así, la rúbrica judicial se proyecta en toda su extensión e intensidad en las opiniones de jueces a título personal y pueden sobrevenir malas interpretaciones y especulaciones. *Para los efectos señalados, un juez siempre es juez.* Esta unidad es concebida del siguiente modo:
> "El Juez no sólo está inserto en el mundo más estricto de su función, sino [en] otro más amplio: el de la sociedad en general. Dentro de ésta, el juez, como cualquier otro, si bien distinto en su función, cumple y representa un papel. Para los otros, para los demás, él es el juez: *dentro y fuera del juzgado es el Juez.*" (Énfasis en el original.) *Ortiz Angleró v. Barreto Pérez*, supra, pág. 104, opinión concurrente.

Si las prohibiciones constitucionales y éticas a los jueces de no participar en campañas políticas de ninguna clase ahora no rigen, cuando se plantee ante un juez que presida una Comisión Local de Elecciones una controversia electoral, ¿no queda tachada *a priori*, en entredicho o en duda la imparcialidad de su dictamen? Si bajo los términos de la resolución mayoritaria se puede entender que hay un man-

dato de que se opongan a la enmienda, ¿cómo exigirles neutralidad? ¿Cómo pedirles que dictaminen contra lo que la mayoría llama "defensa de la independencia judicial"?

Otra vez invocamos a *Ortiz Angleró v. Barreto Pérez*, supra, págs. 97–98, opinión concurrente:

> ¿Por qué concebir desacertadamente que la Rama Judicial tiene que actuar como los otros dos poderes políticos exponiendo y adoptando posiciones, y anticipando criterios sobre asuntos volátiles, cuya decisión no es de su jurisdicción en ese momento? ¿Ayuda en algo a su imagen el que algunos jueces se manifiesten en contra y otros a favor de la enmienda constitucional? ¿Puede separarse, para fines éticos, el pronunciamiento público a título personal de un juez, de aquel que irradia de la mera condición del cargo? Cuando cualquier magistrado de reconocido prestigio habla en ocasión de una actividad oficial relacionada con la administración del sistema de justicia, ¿puede desdoblar su persona a cuando pronuncia un discurso distinto en otro foro? ¿Es posible dividir la personalidad del juez, divorciando su opinión personal de la del símbolo del jurista? ¿Vamos a olvidar la idoneidad y ejemplaridad que proyecta los pronunciamientos de los jueces? ¿Es que tales opiniones personales carecen de impacto psicológico comunitario, en virtud del rango, categoría y carisma profesional que los jueces poseen? Finalmente, ¿se reducirá o no el elemento de imparcialidad y neutralidad judicial de proliferarse los pronunciamientos públicos de los jueces?

## VIII

*Méritos de la queja contra el Juez Superior Hon. Pierre Vivoni*

Individual y a nombre de los doscientos cuarenta (240) jueces que pertenecen a la Asociación de la Judicatura Puertorriqueña, el Juez Superior, Hon. Pierre Vivoni —en violación de lo dispuesto en la Constitución, en los Cánones de Ética Judicial, y contrario a una recta tradición judicial— ha comenzado, de forma inpermisible, una campaña en prensa, radio, televisión, clubes y otros foros, para promover la posición de que se vote *en contra* de que los electores fijen en nueve (9) el número de Jueces de este

Tribunal. Esa posición coincide con la asumida por el P.P.D. y P.I.P. traducida en sus respectivas campañas. ¿Cómo puede la mayoría archivar la queja ética contra el Juez Pierre Vivoni, quien llegó al extremo de, en patente actitud político-partidista beligerante, retar públicamente al Gobernador Hon. Pedro Rosselló González a debatir sobre las enmiendas constitucionales?

*La fragmentación y laxitud ética que presupone la resolución mayoritaria es ilógica y contradictoria. No se puede servir simultáneamente en dos (2) vocaciones: Juez-Político. El principio de imparcialidad y neutralidad de la Judicatura —nervio de nuestras instituciones democráticas— no admite que al servicio de una se inmole la otra.*

## IX

*Resolución propuesta que vindica valores constitucionales y éticos*

A tono con el panorama político-partidista puertorriqueño del presente, debimos adoptar la siguiente resolución, dándole plena vigencia y reafirmando las prohibiciones constitucionales y éticas:

> En el descargo de nuestra encomienda de pautar la conducta de los miembros de la Judicatura del país, en virtud del mandato de la Sec. 12, Art. V de la Constitución, y en aras de "promover la independencia del poder judicial como factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática", y el mantenimiento de una postura de neutralidad y objetividad oficial —Canon XIII de los de Ética Judicial— y siguiendo la más honorable tradición, determinamos que al presente resulta impropio y censurable todo pronunciamiento público —fuera del que sea necesario dentro de la función adjudicativa— a favor o en contra de cualquiera de las propuestas enmiendas constitucionales del Referéndum del 6 de noviembre de 1994 por cualquier miembro de la judicatura puertorriqueña.
>
> Este precepto ético en nada afecta el votar en el referéndum y ejercicio a la libre expresión de todo magistrado en el ámbito privado, con sujeción a los restantes Cánones de Ética Judicial.

# X

*Conclusiones*

Amén de inconstitucional, es muy peligroso y dañino que se pretenda empujar a toda la Rama Judicial a una contienda altamente matizada por el factor político-partidista, a sabiendas que la ciudadanía nunca ha tenido claro el deslinde de funciones en la administración de la justicia (Policía, Fiscalía, Judicatura, Corrección), y con demasiada frecuencia se nos responsabiliza por fallas que corresponden a esos otros componentes del Gobierno; a la postre, todo el riesgo lo corre el prestigio del Sistema Judicial.

Una vez la Rama Judicial —como poder institucional— ha tomado partido en el proceso de referéndum, ¿quién garantiza los comicios de 6 de noviembre de 1994, en gran parte anclado en los jueces que presiden las Comisiones Locales de Elecciones? ¿Podrá luego el Sistema Judicial adjudicar las contiendas que surjan antes, durante y después de ese evento eleccionario? En buena doctrina y práctica constitucional, ¿se puede ser parte y juez? "La independencia institucional del Poder Judicial deriva inexcusablemente de la esencia de su función: determinar el Derecho y atribuir derechos. Teniendo ésta como base el conocimiento, que no tolera mandatos —*porque nunca podría convertir lo falso en verdadero, ni al contrario*— *su independencia brota como exigencia lógica, al margen de cualquier contingencia política.*" (Énfasis suplido.) V. Comeiro, citado por R. de Marino, *La independencia de los tribunales, garantía de su función*, 1988 Rev. Der. Proc. 431, 437 (1988).

La mayoría del Tribunal no puede promulgar una filosofía político-partidista, aun para combatir un cambio a una de las disposiciones del Poder Judicial expuestas en el Art. V de nuestra Constitución, *supra*. Se trata de un asunto que pertenece a las ramas políticas. No podemos

fomentar, mucho menos oficializar, que los jueces se conviertan en proselitistas, como tampoco permitir que asuman la defensa de posturas en contrario.

La mayoría del Tribunal da la espalda a la letra y el espíritu de la Constitución, a los Cánones de Ética Judicial e ignora totalmente la buena tradición democrática. Como resultado, la Rama Judicial ha establecido un cuarto partido político, no inscrito. Una vez culmine el evento electoral del referéndum, ¿cómo podremos retirar el banderín de postura oficial para enarbolar el estandarte de la fiel balanza, recuperar la confianza ciudadana perdida y pretender que se nos crean y respeten nuestras decisiones?

Históricamente la toga se tiñe de negro, en función de neutralidad político-partidista, ecuanimidad, prudencia y sobriedad. No hay derecho a teñir en forma distinta la toga judicial y después calificar su color como oficial. Tampoco se puede permitir que cada juez haga con su toga lo propio, según le plazca.

Nuestro actual diseño constitucional no permite al Tribunal Supremo reclamar los poderes que la Constitución no le da; menos, oficializar y promover campañas impregnadas y de claro contenido político-partidista.

Al igual que en los tiempos de Rousseau y Montesquieu, la división de funciones públicas entre los Poderes Ejecutivo, Legislativo y Judicial, *sigue siendo el mejor antídoto contra la tiranía de uno solo.*

*La más preciada fuente de autoridad está en la fuerza persuasiva inherente de nuestros fundamentos y nuestras decisiones.* En la medida en que *vía interpretación o reglamento* recurramos al artificio, el sofisma, al fingimiento, destrozamos el fundamento del alto sitial de este Foro, trabajo de muchas generaciones que nos precedieron y del cual todos somos *celosos custodios.* Somos testigos de un esquema reglamentario *simbiótico —Jueces[-Políticos]—* que excede lo racionalmente tolerable. ¡Y lo peor de todo, convirtiendo a la mayoría de este

Tribunal en *juez y parte* de la *in*constitucionalidad de sus *propios actos!* (Énfasis en el original.) *Regl. Creac. y Func. Unidad Esp. J. Apel.*, 134 D.P.R. 670, 715–716 (1993), opinión disidente.(7)

___

(7) "Descargamos la tarea anticipando la crítica seria, honesta y responsable. También aceptamos la injusta, producto de lo volátil del asunto y del apasionamiento de mentes fanáticas, cerradas o prejuiciadas. *Estamos acostumbrados.* Como jurisprudentes siempre tratamos de desentrañar la *verdad jurídica objetiva*, misión que en una sociedad civilizada es una de las formas más elevadas de manifestar nuestro respeto hacia la dignidad humana. 'No disfrutamos de un exceso de instituciones dedicadas a la búsqueda racional de la verdad ... los jueces están entrenados para abrocharse sus abrigos y resistir las ventiscas de la propaganda, no importa la dirección en que éstas soplen'. (Tradución nuestra.) P.A. Freund, *The Supreme Court of the United States*, Nueva York, MacMillan Co., 1961, págs. 189–190." (Énfasis en el original.) *Gierbolini Rodríguez v. Gobernador*, supra, pág. 412, opinión disidente.

# APÉNDICE

---

NOTA DE LA COMPILADORA:
    La indefinición gráfica se debe a la reducción del modelo. Los originales constan en el expediente de este caso en el Tribunal Supremo.

*The San Juan Star — Thursday, July 22, 1994*

# LOCAL NEWS

# Vivoni vows to pursue referendum campaign

**By MANNY SUAREZ**
Of The STAR Staff

Despite the avalanche of criticism heaped upon him by Gov. Rosselló and the New Progressive Party, Judiciary Association President Pierre Vivoni on Wednesday said he "will continue with a program geared toward educating the public on the "negative impact" of the proposed judicial reform.

In a telephone interview, Vivoni said that the reaction from the government was predictable, "but I said from the beginning that we would be carrying on a civic campaign to alert the public to how these changes will affect them. This will not be a political campaign.

"The Constitution gives the Supreme Court the right to determine its needs and the constitutional referendum changes that," he said. "We believe it will be a grave error for the public to vote without seeing both sides of the coin and that is all we are trying to do."

He added that the campaign is being carried out with the knowledge and consent of Chief Justice José Andrés García.

The referendum would permit the administration to increase the size of the Supreme Court from seven to nine members without the consent of the court. As the Constitution now reads, any move to change the size of the Supreme Court must initiate with the Supreme Court itself.

Asked if the situation would have been different if the NPP granted funds to the opposition political parties to campaign against the proposed changes, Vivoni said: "If that had happened, the association would have had to re-evaluate its position. I personally don't believe it would have changed anything; the proposed changes would still have been injurious to judicial independence and the balance of powers and I believe we would still have been duty bound to so inform the public."

"That, however, is my opinion and the association may see it otherwise. Everything we are doing is with the authority of the board of directors, which includes delegates from throughout the island."

Vivoni denied allegations that the reform is based on a study carried out for the Judicial Conference by a committee headed by former Supreme Court Justice Carlos Irizarry Yunqué.

"The study called for strengthening judicial independence by granting lifetime appointments for judges with a review of his or her performance. It also called for judicial independence by giving the judiciary fiscal autonomy by giving it a fixed percentage of the government's budget the way the university has," he said. "That was not in the governor's bill.

"But even if it was, the judges overwhelmingly rejected the proposal by the committee," Vivoni said.

The Guayama Superior Court judge added that there were other differences in the bill, scheduled to be signed by the governor today, and the proposal of the Judicial Conference committee.

Vivoni said that if a Popular Democratic Party administration instead of an NPP administration made the proposal, the position of the judges' association would have been no different.

"We would have defended judicial independence as vehemently as we did in 1988 when Gov. Rafael Hernández Colón attempted to interfere with judicial independence by trying to replace a Superior Court judge on the basis of one decision," Vivoni said.

The reference was to Hernández Colón's attempt to replace Superior Court Judge Guillermo Arbona. The Supreme Court, the Bar Association and the Judiciary Association rose up as one in defense of Arbona.

ANEJO 1

ANEJO 2

## LOCAL NEWS

# Campaign set against top court change

By MANNY SUAREZ
and JAVIER MAYMI
Of The STAR Staff

The Judiciary Association, the organization of the island's judges, has begun organizing a campaign against Gov. Romeló's proposed constitutional amendment to increase the size of the Supreme Court.

That prompted charges Tuesday from New Progressive Party lawmakers that Superior Court Judge Pierre Vivoni, the president of the 249-member Association, was violating the Judicial Ethics Code and the Constitution.

Sen. Charlie Rodriguez, NPP-at large, said Vivoni violated "freedom judicial principles" by saying the association would campaign against the increase of Supreme Court justices to nine from its present seven — one of three issues on the ballot in the Nov. 6 referendum.

Vivoni said that he was not acting politically by launching an "educational" campaign against the proposal.

"This is a civic educational program, not a political campaign," Vivoni said.

But Rodriguez, flanked by Sen. Dennis Velez Barlucea, said Vivoni's intentions of entering a political campaign ... that the judicial branch would lose the "neutral state" that is expected of a judge.

"I have no problem with Vivoni entering the political ranks," Rodriguez said. "But he should stop being a judge before he does. Judges are supposed to be referees in the process, not players."

Rodriguez said Vivoni's comments violated their different canons in the Judicial Code and also violated Article V, Section 12, of the Constitution, which states that "judges are not allowed to participate in political campaigns."

"That's what they have political parties for," Rodriguez said. "Vivoni should continue to voice his opposition by continuing his advice to the Popular Democratic Party, but not by making his opinions public. If Vivoni wants to jump into a political debate, so be it, but let him take himself off the bench."

The preamble to Canon 18 of the Judicial Code of Ethics says:

"The judges should protect and promote this independence of the judiciary as a stabilizing factor in our democratic system. Toward that end, a judge should abstain from participating in the political process, without undermining, however, his right of suffrage, his political ideals and to the rights and functions fixed on him by the electoral laws and rules."

Vivoni confirmed that the association's campaign would have judges talk about the reform with civic organizations as the Lions and Rotary Clubs and local Chambers of Commerce.

The campaign, however, is civic, not political, Vivoni said.

What the administration is doing will have a severe impact on the operations of a court system that works very well and we have an obligation to inform the people how these changes will affect them," said Vivoni. "The Legislature and the governor do not know how the judiciary works, yet they have taken it upon themselves to make drastic changes in the system."

Rodriguez said he will ask chief justice Jose Andreu Garcia to discipline Vivoni. If Andreu Garcia does not act, Rodriguez said may see Vivoni.

"I would not hesitate to take legal action against Vivoni," Rodriguez said. "Vivoni doesn't have the right to make such comments and he knows it. What he did is an open, blatant violation of the Judicial Code."

Romeló's bill authorizing the referendum, however, contains no funds for the political parties to campaign for or against the three issues.

Superior Court Judge Juan Corujo Collazo, who was appointed to the bench by former Gov. Rafael Hernandez Colón in 1992, said:

"The administration didn't have it both ways. It didn't say the reform is not political and deny funds to the minority parties to campaign against the so-called reform and then say that what we want to do in defense of judicial independence and the balance of powers is political."

ANEJO 3

## Hora Asoc. Judicatura

# Campaña contra aumento jueces

**The Associated Press**

La Asociación Puertorriqueña de la Judicatura hará una campaña pública contra la decisión del gobernador Pedro Rosselló, de propulsar una enmienda constitucional que permitiría aumentar de 7 a 9 los jueces miembros del Tribunal Supremo. De ser factible, la campaña incluiría un debate sobre el tema entre Pierre Vivoni, presidente de la Asociación y el gobernador Rosselló González.

Sin embargo, Vivoni dijo que la Asociación no reclamará asignación de fondos públicos para encabezar la oposición a esta medida durante el referéndum que se celebrará el 6 de noviembre próximo. La Asociación acordó que en este de la enmienda constitucional, en el que se elimina el precepto de independencia judicial y de separación de poderes, todo juez participe en una campaña de orientación pública para ilustrar al pueblo de los peligros que conlleva esta medida, dijo Vivoni en entrevista radial (WPAB).

Agregó que este es un asunto de tanta importancia que amerita esta campaña de orientación pública, para exhortar al pueblo a rechazar la propuesta enmienda en las urnas. Vivoni adelantó que la Asociación esbozará un programa que incluye la comparecencia de magistrados a distintos foros sociales, incluyendo dictar conferencias contra la medida en los Clubes de Leones, Rotarios y Kiwanis, así como participar en programas de televisión y radio.

LCDO. PIERRE VIVONI
Preside la entidad

EL VOCERO, San Juan —Lunes 18 de Julio de 1994.

720

ANEJO 4

## Afirman 2 Senadores

# 'Asoc. Judicatura viola la ley'

**Agencia EFE**

La Asociación Puertorriqueña de la Judicatura está impedida por ley de llevar a cabo una campaña en el referéndum sobre enmiendas constitucionales, según los senadores novoprogresistas Charlie Rodríguez y Dennis Vélez Berlucea.

Los legisladores denunciaron en conferencia de prensa que el presidente de la Asociación Puertorriqueña de la Judicatura, Pierre Vivoni, viola cánones de la ética judicial al impulsar una campaña en contra de la propuesta enmienda constitucional para fijar en 9 el número de jueces del Tribunal Supremo. Rodríguez y Vélez Berlucea reclamaron al juez presidente del Tribunal Supremo, José Antonio Andreu García, que "discipline al juez Vivoni".

Según los senadores al hacer la campaña contra el alza en los jueces del supremo, Vivoni viola "el Artículo V", Sección 12 de la Constitución" que esta-

**CHARLIE RODRÍGUEZ**
Cita cánones de ética

blece que ningún juez participará en campañas políticas de clase alguna". El senador Rodríguez recalcó que los jueces tienen limitados sus derechos

**DENNIS VÉLEZ**
Pide disciplinen juez

de expresión y reafirmó que Vivoni viola los cánones III, VII, VIII, XI y XIII de la ética judicial.

Los cánones citados por

**PIERRE VIVONI**
Pres. Asoc. Judicatura

Rodríguez tienen que ver con la conducta de los jueces, y entre otros argumentos disponen que "en aras de la preservación de

(Pasa a la Pág. 55)

ANEJO 6

EL VOCERO, San Juan — Miércoles 20 de Julio de 1994

# Referendo

## Afirma que desinformados podrían votar enmendar Constitución afectando democracia

El Juez presidente del Tribunal Supremo, Lcdo. José A. Andreu García, aseguró el martes que sí los votantes están mal informados o desorientados en torno al texto y a las consecuencias de enmiendas a la Constitución "y aún así votan a favor de ellas, el golpe a nuestro sistema democrático sería devastador".

"Las enmiendas a la Constitución son parte integral de nuestro sistema democrático, pero solamente sí son refrendadas por el voto mayoritario de una ciudadanía bien informada y educada en cuanto a los derechos y facultades que estaría cediéndole al Estado", expresó el Juez Presidente, que participó en un foro público educativo auspiciado por la Fundación Facultad Eugenio María de Hostos en Mayagüez.

Andreu García explicó que la Constitución de Puerto Rico forjó "un andamiaje protector, aislando a la Rama Judicial de las intervenciones indebidas de las otras ramas constitucionales de gobierno, con el propósito de garantizar la independencia judicial".

"Una de las disposiciones constitucionales en este respecto es la del Artículo V, Sección 3, que dispone que el número de jueces del Tribunal Supremo sólo podrá ser variado por ley a solicitud del propio Tribunal Supremo", manifestó.

El juez Andreu García sostuvo que la razón de ser de estas disposiciones constitucionales es el no exponer al sistema judicial a las represalias, presiones y a situaciones de indebida intervención de las ramas políticas. "La independencia judicial le asegura al ciudadano que la adjudicación que el juez haga de su caso o controversia, aun cuando el propio Estado sea el demandado, será imparcial y libre de las influencias coercitivas de las ramas políticas", añadió.

El Juez Presidente, a quien se le pidió que hablara sobre "la Reforma Judicial y el balance de poderes en la Constitución de Puerto Rico", rechazó que la Reforma Judicial propuesta tendrá como resultado un aumento en la carga de trabajo del Tribunal Supremo. Por el contrario, señaló...

quedó aprobada la Ley de Reforma Judicial "mediante la disminución de esa carga, por lo que no es necesario el aumento de los jueces de dicho tribunal"

"En estos momentos en que comenzamos un proceso hacia un referéndum, mediante el cual las ramas políticas pretenden eliminar la disposición constitucional en cuestión, quitarle la facultad a nuestro Tribunal Supremo y aumentar y fijar el número de jueces en 9, tenemos todos la responsabilidad histórica de, que nuestro pueblo conozca las consecuencias y repercusiones de la decisión que tome dentro de pocos meses", indicó.

LCDO. JOSE A. ANDREU GARCIA
Juez presidente del Supremo

722

ANEJO 5

# Urge voto concienzudo al cambiar la Constitución

Por ANGEL JOSE DE LEON
DE EL NUEVO DIA

EL JUEZ Presidente del Tribunal Supremo de Puerto Rico. José A. Andréu García, describió como "devastador" el golpe al sistema democrático si la ciudadanía vota a favor de las enmiendas propuestas a la Constitución sin estar totalmente orientada.

Las expresiones de Andréu García surgieron de un mensaje que ofreció ayer en la Fundación Facultad de Derecho Eugenio María de Hostos; en Mayagüez.

Según el Juez Presidente la ciudadanía

## Cuestiona los derechos que se le cederían al Estado

debe estar muy orientada sobre el texto de las enmiendas y las consecuencias que las mismas conllevan.

Andréu García hizo referencia a las enmiendas constitucionales que serán llevadas al pueblo en la próxima consulta, en especial, la enmienda que propone aumentar el número de jueces del Tribunal Supremo.

SOSTUVO Andréu García nuevamente que un aumento en el número de jueces de ese tribunal debe hacerse únicamente a petición de los propios jueces que componen el Tribunal y no por iniciativa de las otras ramas al alegar "balance ideológico".

"Las enmiendas a la Constitución son parte integral de nuestro sistema democrático, pero solamente si son refrendadas por el voto mayoritario de una ciudadanía bien informada y educada en cuanto a los derechos y facultades que estaría cediéndole al Estado", manifestó Andréu García.

Al hablar sobre la separación de poderes, Andréu García señaló que el propósito de esa separación es asegurar la libertad del individuo contra la opresión de cualquier rama y salvar al pueblo de la autocracia o tiranía. Explicó que esa separación de poderes no es absoluta, pues las ramas de Gobierno están interrelacionadas entre sí y la distribución de poderes gubernamentales entre las tres ramas "inevitablemente conlleva algún grado de fricción".

Además, el Juez Presidente del Supremo señaló sobre la independencia judicial, que la misma fue recientemente reconocida y defendida por jueces presidentes de tribunales supremos de diversos países cuando se reunieron en un hotel de la capital para celebrar la III Conferencia Judicial de las Américas.

INDICO también que "la Constitución del Estado Libre Asociado de Puerto Rico forjó un andamiaje protector, aislando a la Rama Judicial de las intervenciones indebidas de las otras ramas constitucionales de Gobierno, con el propósito de garantizar la independencia judicial".

De paso, el Juez rechazó que la reforma judicial propuesta tendrá como resultado un aumento en la carga de trabajo del Tribunal que él preside. Según Andréu García la reforma propuesta disminuye la carga de casos por juez, por lo que se hace innecesario tener que aumentar el número de jueces asociados del Tribunal Supremo.

EL NUEVO DIA-SABADO 23 DE JULIO DE 1994 **17**

ANEJO 7

> "Esto lo debe decidir el pueblo de Puerto Rico"

# 'Campaña politiquera' con el alza de jueces

Por PEPO GARCIA
DE EL NUEVO DIA

VEGA BAJA - El gobernador Pedro Rosselló acusó a "varios jueces" de llevar a cabo una campaña "política y politiquera" en torno a la propuesta enmienda de aumentar de siete a nueve los jueces del Tribunal Supremo.

De igual manera reaccionó contra el juez presidente del Tribunal Supremo, José A. Andreu García, quien manifestó hace varios días que "si un pueblo desinformado aprueba la propuesta de fijar en nueve el número de jueces del Tribunal Supremo, el sistema democrático recibiría un golpe devastador".

"Es una expresión y una demostración de la idea que tiene el Juez Presidente del pueblo de Puerto Rico. El pueblo de Puerto Rico está bien informado y yo creo que esto es una expresión de una actitud elitista del Juez Presidente, que cree que esto lo deben decidir siete jueces".

ROSSELLO REAFIRMO que el aumento de siete a nueve jueces en el Tribunal Supremo es un asunto que lo debe decidir el pueblo. De hecho, la enmienda también procura quitarle la prerrogativa que actualmente tiene el Tribunal Supremo de solicitar un aumento o una disminución del número de jueces del máximo foro judicial.

"Aquí esto lo debe decidir el pueblo de Puerto Rico y el pueblo de Puerto Rico está informado. Mucho más informado de lo que cree el Juez Presidente y, debo decir, probablemente más informado que el Juez Presidente en las experiencias de la vida, en las experiencias del que tiene que llevar un caso a través de los Tribunales de Puerto Rico".

"Yo creo que es una expresión desafortunada, en esencia minimizando la capacidad del pueblo de Puerto Rico, al decir que está incapacitado y desinformado para tomar esta decisión", agregó el Gobernador en ocasión de inaugurar un proyecto en Vega Baja, destinado a controlar las inundaciones del río Cibuco.

AL PREGUNTARSELE si Andreu García debería disciplinar al presidente de la Asociación Puertorriqueña de la Judicatura, Pierre Vivoni, por éste anunciar que harán campaña en contra de la propuesta enmienda de aumentar de siete a nueve los jueces del Tribunal Supremo, Rosselló indicó que "el juez Vivoni puede subsanar eso también declarándose candidato político y entrando de manera bonafide a la lucha política".

"No es malo estar en el campo político, pero en nuestra tradición los jueces no participan usualmente en eso. Hemos visto una campaña política y politiquera de parte de algunos jueces y yo estoy siendo claro que no es de la judicatura completa, de parte de algunos jueces".

En torno a la expresión de Andreu García, quien planteó la posibilidad de que el pueblo pueda estar desinformado, Rosselló sostuvo que "este pueblo es uno democrático. Se basa en la gente y el Juez Presidente lo que lleva es una campaña para que esa toma de decisión sea a base de un grupúsculo pequeño de unos jueces, que desafortunadamente no tienen la experiencia que tiene nuestra gente en el diario vivir".

"VIVONI, POR decisión propia, ha entrado en el campo de la discusión política. Escuché que me retó a un debate y, por lo tanto, lo único que le falta es renunciar a la judicatura y convertirse en candidato político. Entonces podría estar en el debate político con mucho más razón".

Sostuvo, finalmente, que las enmiendas a la Constitución deben ser contestadas por el pueblo como unas preguntas cívicas, razón por la cual, indicó, no se deben asignar fondos públicos a los partidos políticos.

# Pide un diálogo con los presos

Por LUIS R. VARELA
DE THE ASSOCIATED PRESS

EL PRESIDENTE de la Comisión de Seguridad del Senado, Rolando Silva, pidió ayer públicamente a la secretaria del Departamento de Corrección y Rehabilitación, Zoraida Buxó, que inicie un diálogo con los dirigentes de las 16 cárceles que hace 13 días decretaron un paro de brazos caídos.

"Yo realicé un buen diálogo con cinco confinados de la cárcel regional de Ponce y me propongo visitar otros presidios para conocer los problemas de los confinados", dijo el Senador del distrito de San Juan.

"No se trata de conocer todo lo que piden, sino de escucharlos, conocer sus planteamientos", agregó.

Silva y uno de los ayudantes del Gobernador en el área legislativa, licenciado José Lozada, estuvieron cuatro horas y media anteayer conversando con confinados como el notorio Clemente Cardona Tirado, conocido por "Papo el Carnicero", para escuchar los planteamientos de 189 presos en la sección de seguridad máxima del Complejo Correccional de Ponce.

> **Silva: "No se trata de conceder todo lo que piden, sino de escucharlos"**

El legislador del Partido Nuevo Progresista dijo que recomendará a Buxó y al director de la Administración de Corrección, Otto Riefkhol, que visiten algunos de los presidios donde se realiza la protesta para conocer los problemas de los confinados.

"Creo que Buxó y Riefkhol deberían conversar con algunos de los dirigentes del paro en un intento porque concluya", dijo el senador novoprogresista a la AP.

BUXO Y RIEFKHOL se niegan a dialogar con los dirigentes de la protesta porque alegan que sería reconocer a grupos organizados en las prisiones y admitir que los presos sigan como antes, mandando en las cárceles".

# Invita a Vivoni a un debate público

Por THE ASSOCIATED PRESS

EL VICEPRESIDENTE de la Cámara de Representantes, Edison Misla Aldarondo, invitó ayer al presidente de la Asociación Puertorriqueña de la Judicatura, el juez Pierre Vivoni, a debatir públicamente en torno a la enmienda constitucional que pretende aumentar el número de jueces del Tribunal Supremo.

Vivoni, en comentarios hechos a la Prensa de Ponce varios días atrás, dijo que no descartaba debatir en torno a la enmienda con el gobernador Pedro Rosselló si la Asociación de Periodistas de Puerto Rico (ASPRO) auspicia el evento.

"Es inaudito y bochornoso el precedente establecido en la judicatura mediante las declaraciones inflamatorias del juez Vivoni de hacer emplazamientos públicos para debatir sobre el tema de la referida enmienda constitucional como si se tratara de un político de oficio", dijo Misla Aldarondo en un comunicado circulado ayer.

Según el Legislador, la actuación de Vivoni pone en entredicho la objetividad con que actúan los magistrados que sirven de jueces presidentes de las respectivas juntas locales de la Comisión Estatal de Elecciones y aquellos que toman las decisiones legales el día que se celebre el referéndum.

ANEJO 9

# Rosselló rails against judges who campaign

**By JAVIER MAYMI**
Of The STAR Staff

Gov. Rosselló saved his toughest words against the judiciary for Monday as he exited the podium at the conclusion of the Constitution Day ceremonies in Old San Juan.

Rosselló and several members of the judiciary, mainly Puerto Rico Judiciary Association President Pierre Vivoni, have been involved in a public tiff regarding the judges' right to speak their minds about the Nov. referendum.

The Rosselló administration is backing an amendment to increase the number of the Supreme Court seats from the current seven to nine — a move some members of the judiciary, including Chief Justice José André García, have opposed.

Rosselló, who has maintained the constitutional amendments on the referendum are of a civic nature, said the judges are engaging in a political campaign and, thus, are in violation of the

**Please see GOVERNOR**
**Page 9**

S.J. STAR & 7-26-94

---

## From Page 2

# Governor

Constitution.

"If they [the judges] want to enter the political arena, then I have no problem with that," Rosselló said. "But let them resign first. If they feel that they can contribute to Puerto Rico in a political debate, so be it. But let them resign first.".

Rosselló — who spoke with the press after Secretary of State Baltasar Corrada del Río addressed a scant audience where police outnumbered civilians — said that he planned to take no legal recourse against the judges. But he left the door open for the New Progressive Party to take action.

"I'm not going to do anything about it," said Rosselló. "But that doesn't mean someone else can't challenge the judges and take legal recourse."

Rosselló claims the judges are violating Article V, Section 12 of the Constitution along with several articles of the Judicial Ethics Code by campaigning publicly. Still, the chief executive said the people will make the final decision.

"This is a question of the people judging the judges," Rosselló said. "Each party has the right to campaign during this referendum. Civic groups have a right to campaign, but the judges, if they're still on the bench, do not have that right."

Rosselló said he believes the public wanted the referendum.

"The referendum was part of our campaign promise and the people elected us," Rosselló said. "We proposed it, it is part of our platform and we believe it's in the best interest of Puerto Rico."

Rosselló said the NPP's campaign committee, headed by Bayamón Mayor Ramón Luis Rivera was to meet for the first time Monday. Also included in the committee are Senate Vice President Nicolas Nigueras, House Vice President Edison Misla Aldarondo, NPP Secretary Marcos Morell, NPP electoral commissioner Carlos Canals, Toa Baja Mayor Victor Soto and Chief of Staff Alvaro Cifuentes.

Rosselló added that Corrada's speech Monday set a "solid foundation" for the NPP's campaign.

"I thought it was an exceptional speech that rounded up all the details," Rosselló said. "And as I said, in the end, the people will judge the judges."

The NPP is expected to launch its campaign Wednesday at the José Celso Barbosa ceremonies slated for Bayamón. Rosselló is the keynote speaker.

**The San Juan Star**

*With the Power of Truth.*

Since 1959

Published by the San Juan Star Co. 6 Acacia Street , San Juan, P.R. 00920 782-4200

~·· ANEJO 10

**Gerardo Angulo**
*Chairman and Chief Executive*

**Andrew Viglucci**
*Editor*

**Antonio Adames**
*Production Director*

**Antonio López**
*Circulation Director*

**José A. Martínez**
*Advertising Sales Director*

**Audrey Walkmaster**
*Commercial Printing Director*

**Sara de la Vega**
*Human Resources Director*

**Barbara LeBlanc**
*Managing Editor*

**Robert Becker**
*City Editor*

**Natalia Muñoz**
*Assistant Managing Editor / Features*

**Stanislaus Palchowsky**
*News Editor*

**Marcos Pérez**
*Assistant Managing Editor / Sports*

## EDITORIAL

# Campaign risks court reputation

We appreciate the issues involved in the newest dispute over the Rosselló administration's judicial reform, in this case focusing primarily on increasing the number of Supreme Court justices from seven to nine.

The New Progressive Party majority in the executive and legislative branches got together and rather too cleverly decided that the referendum to be held in November is a civic issue and therefore no funds should be assigned to political parties to campaign either for or against the three points of contention: limiting the terms of political offices, eliminating the absolute right to bail, and expanding the high court.

The absence of funds would hurt the Popular Democratic Party's ability to oppose expanding the Supreme Court, which they have vigorously criticized.

Then, Superior Court Judge Pierre Vivoni, president of the Judiciary Association, a 220-member association of Municipal, District and Superior Court judges, got even more clever. He said, in effect, if the NPP said the issue is not political, then we judges can undertake an educational campaign against the judicial reform.

When politicians get sly and crafty, it is more or less expected of them. It's different with judges. They rarely unite to campaign on public issues, and with good reason. They are the trustees of the system of justice and must avoid implications of bias or conflict of interest, or even the appearance that they are getting involved in political or ideological matters.

And, all semantics aside, November's referendum is a hot political issue that has progressives lined up against the PDP.

We think Chief Justice José Andreu García has been doing an effective job of defending his perception of the judicial system against reforms that he does not agree with. Judge Vivoni's objections seem to be in accord with Andreu's.

If Vivoni and the other 219 members of the association are truly interested in a civic campaign of education, then each time judges appear before audiences, they should represent the various sides of reform, both pro and anti. There are enough of them to do it.

Otherwise, an out-and-out campaign against reform in the name of this important association of so many judges will do more harm to the reputation of the organization than good, and cast more shadow on the workings of the system of justice than light.

## LOCAL NEWS

ANEJO 11

Independent Sen. Sergio Peña Clos, right, discusses the campaign for passage of three constitutional amendments on the November ballot. New Progressive Party Sens. Kenneth McClintock, left, and Roberto Rexach Benítez, who are part of a Senate group supporting the initiative, listen to Peña Clos.

STAR photo by Farah Rivera

# Senate group to promote constitutional amendments

## Campaign to focus on bail, high court and limits on terms

By JORGE LUIS MEDINA
Of The STAR Staff

Senate President Roberto Rexach Benítez announced Friday the creation of a Senate group to campaign for Constitution amendments to limit the right to bail, fix the number of Supreme Court justices at nine and limit the terms of office for governors, mayors and lawmakers.

The group's members include Rexach, Senate Majority Leader Charlie Rodríguez, Sen. Kenneth McClintock, NPP-at large, and Sen. Sergio Peña Clos, an independent lawmaker. Rexach said Senate Vice President Nicolás Nogueras will possibly join the group.

Rexach, who was accompanied by Peña Clos and McClintock, said the group will develop a campaign through television and radio broadcasts, neighborhood assemblies, mass meetings and the like.

While Rexach could not give a precise estimate of how much the group would spend, he said it could go from $35,000 to $60,000. The money would be raised through fund-raisers, cocktails, direct donations and other activities.

The last leg of the three constitutional amendments, the fixing of Supreme court justices at nine, was approved this week by the Senate and is now before the House, where it is expected to be approved next Tuesday along with the enabling act for the Nov. 5 referendum.

The lawmakers insisted the law will provide more than enough time —at least 90 days —to campaign for

the referendum. McClintock said that when the commonwealth was created in 1952, the Popular Democratic Power gave the people only 27 days — from Feb. 4, 1952, to March 3, 1952 — to evaluate the Constitution as a whole and vote for it yes or no.

Shortly before Rexach, Peña Clos and McClintock held their news conference, Puerto Rican Independence Party president Rubén Berríos announced that his party will campaign against the three amendments.

Berríos, who was accompanied by PIP vice president Fernando Martín and Rep. David Noriega, PIP-at large, said the amendments were an attempt to limit individual rights and violated the doctrine of separation of powers in terms of the Supreme Court amendment.

The PIP leader also fired salvos against PDP president Héctor Luis Acevedo, whom he said was an op-

Please see CAMPAIGN, Page 7

728

## LOCAL NEWS

From Page 2

## Campaign

portant who did not dare assume a clear position concerning limiting the right to bill.

Acevedo recently announced that the PDP would oppose fixing the number of Supreme Court justices at nine, campaign in favor of limiting the terms of office, and leave party members to decide for themselves whether, in support or reject the bail limitation amendment.

Meanwhile, State Elections Commission president Juan R. Melecio testified before the House Government Committee that his agency would try to adjust its referendum organizational budget to the $4.5 million allocated by the enabling law. Earlier SEC estimates said it would need at least $6.1 million to organize the event.

The law, noted Melecio, did not include monies to pay for voter transportation nor for the cost of printing and distributing materials explaining the amendments to the voters. He added that the SEC still owes $600,000 from the 1991 referendum and last year's status plebiscite.

NPP alternate electoral commissioner Juan M. Toledo backed the referendum bill fully, while both the PDP and PIP commissioners suggested amendments and questioned its constitutionality.

The constitutional question arose over the fact that the law will not allocate funds to the political parties, while at the same time lowering the amount of money they and civic groups can receive from individual contributors from $5,000 to $3,000.

PDP commissioner Modesta Alberty said that by denying funds to the political parties, the enabling law was actually ensuring a low voter turnout.

Alberty also opposed using a single ballot for the three proposed amendments, and recommended separate ballots of different colors in order to make things easier for illiterate voters.

PIP commissioner Manuel Rodríguez Orellana agreed that the parties should be provided government funds for the campaign. He also proposed that government ads be banned prior to the referendum, and urged that the SEC be empowered to deal with abuses on the part of political action groups.

ANEJO 12

# PRIMER PLANO

EL NUEVO DIA - SABADO 15 DE JULIO DE 1994

## Ataja la CEE los anuncios

Por NILKA ESTRADA RESTO
DE EL NUEVO DIA

EL PRESIDENTE de la Comisión Estatal de Elecciones, Juan R. Melecio, recomendó ayer que los medios de comunicación rindan informes sobre los anuncios de campaña que pautan los partidos y grupos articulares previo al referéndum de noviembre.

Esta información, sobre las cantidades de anuncios y dinero gastados en los medios, servirá para compararla contra los informes que por ley están obligados a rendir los partidos y grupos de acción política, manifestó Melecio.

El Presidente de la CEE hizo las manifestaciones en vistas públicas de la Comisión de Gobierno de la Cámara de Representantes, en las que se discute el proyecto que aria paso a la celebración de un referéndum en noviembre de este año.

El proyecto de la Cámara 1463, suscrito por la mayoría del Partido Nuevo Progresista, propone enmendar la Constitución para eliminar el derecho absoluto a la fianza, aumentar a nueve la cantidad de jueces del Tribunal Supremo y establecer límites los cargos electivos. También asigna $5.5 millones a la CEE para organizar y realizar referéndum y otros $2.5 millones para que la CEE haga una campaña de información y orientación.

MELECIO REITERO ayer que la Comisión necesita $6.1 millones para el referéndum, pero dijo que harán los ajustes correspondientes, y si hacen falta fondos adicionales acudirá a la Legislatura. Recordó que siempre hay gastos imprevistos y uso como ejemplo el caso del litigio radicado para el plebiscito del 93 por el ex senador Roberto Sánchez Vilella, que presentó para la CEE un desembolso de us de $100,000.

El presidente de la CEE, quien dijo que recibió copia del proyecto el jueves en la noche, visto el viernes en la mañana a la Cámara para presentar una serie de enmiendas mayormente de estilo e hizo una presentación verbal, a base de un borrador. La propuesta más sustantiva fue la relativa los informes de los medios de comunicación.

## Enarbolan la bandera del

Por PEPO GARCIA
DE EL NUEVO DIA

EL PARTIDO Independentista Puertorriqueño (PIP) determinó llevar a cabo una campaña en contra de las tres propuestas de enmiendas que le serán presentadas al pueblo, mediante un referéndum que se celebrará el 6 de noviembre de este año.

El presidente de la colectividad, Rubén Berríos, en compañía del representante del PIP, David Noriega, y del ex senador y

vicepresidente de la organización política, Fernando Martín, indicó que la decisión la tomó el comité central del PIP, compuesto por los presidentes de los comités locales y los miembros de la comisión política.

Con esta decisión, el PIP les dice 'No' a la propuesta de restringir el derecho a la fianza, la limitación de los términos electivos y el aumento de siete a nueve de los jueces del Tribunal Supremo.

"Básicamente, esto se trata de un intento para coartar los derechos a los individuos,

Juan R. Melecio recomendó que los medios de comunicación rindan informes sobre los anuncios de campaña.

De aprobarse la misma, los medios tendrían que informar a la Comisión sobre el gasto publicitario de partidos y grupos, una vez al mes hasta octubre del 1994 y el último informe abarcaría del primero al 6 de noviembre.

Tras la ponencia de Melecio, compareció el comisionado alterno del PNP, Juan Toledo, quien respaldó el proyecto en su totalidad.

EN CAMBIO, el comisionado del Partido Independentista Puertorriqueño, Manuel Rodríguez Orellana, presentó tres enmiendas: que se prohíba la divulgación de anuncios gubernamentales en el periodo preelectoral; que se le dé poder a la CEE para evitar los "abusos y excesos" de los comités de acción política y que se provea financiamiento adecuado a los partidos políticos para hacer campaña.

El proyecto como ha sido redactado es "mezquino", según dijo, porque sólo asigna fondos a la CEE y ésta lo que va a hacer es dar a la publicidad el texto de las enmiendas redactadas por el PNP, "ni siquiera el texto actual de la Constitución para comparar".

En cuanto a las campañas de publicidad de las agencias del Gobierno, Rodríguez recordó que para el plebiscito de 1993 se impuso una veda a estas anuncios durante el periodo preelectoral. Ahora, sostuvo, "el Gobierno se está despachando con la cuchara grande" y mantiene en el aire una campaña "absurda de telenovela de la Policía, que claramente está a favor de uno de los asuntos que se va a decidir en el referéndum".

"Hay otros propósitos detrás de todo esto"

Rubén Berríos: "un intento para coartar los derechos a los individuos".

El equipo hará visitas pueblo por pueblo

**7**

Kenneth McClintock, Roberto Rexach Benítez y Sergio Peña Clós, se constituyeron en el "equipo de campaña" del Senado que abogará por el voto a favor de las tres enmiendas a la Constitución.

## iple 'No'

...tentado contra la separación de poderes engañar a la opinión pública, hay otros propósitos detrás de todo dijo Berríos. .

...IDER independentista explicó que "...no del derecho a la fianza se de... ...presado de que se va a la c...inalidad, y el otro engaño, Berríos, es que con la limitación de ...nicos electivos una persona puede tres cuatrienios seguidos en la Cá...Representantes, tres adicionales en ...do y tres más como alcalde. Además, cargo a la gobernación conllevaría ...enciones.

...es informó ayer que varios líderes ...fdo Popular Democrático van a vo...entra de todas las propuestas; "aun ...ctitud pusilánime del Partido Popu...

de líderes del Partido Popular que ...s contra de la violación del derecho ...mienda y no están a favor de la ...a del presidente", dijo Berríos, refi... a Héctor Luis Acevedo, quien se ...l aumento de los jueces, pero favo...limitación de los términos electivos ...atricando del derecho a la fianza, ...en esta última propuesta de en...la organización política decidió de...manos de su militancia la discreción ...o.

...es ...re irresponsabilidad no su...a f ...o", prosiguió Berríos, refi...e a ...rdo. "Es Héctor Luis Ace...do y el pueblo merece que haya una ...n. La actitud del PPD hace difícil ...r una opinión pública en contra de ...os del Gobierno", agregó.

...A PREOCUPACION que dio a co...oyer Berríos es la no asignación de ...públicos a los partidos políticos ...var a cabo una campaña en contra ...ropuestas de enmienda a la Consti...

...egare a otorgar fondos públicos es... ...estando la voluntad popular", se...Berríos.

...ga, por su parte, indicó que la situa...agrava al no establecer la prohibi...los anuncios gubernamentales. La ...del PNP ha establecido que una ...ción corresponde a las elecciones ...s y no aplica a un referéndum supe...enmienda a la Constitución del li...bre Acevedo.

...esentante sostuvo que la inestabi...de las personas con el gobierno de ...osello será el móvil que lo llevará ...en contra de las tres propuestas de ...da del Ejecutivo.

# Invaden el campo de batalla

Por NILKA ESTRADA RESTO
DE EL NUEVO DIA

TRES SENADORES novoprogresistas y un ex senador popular se constituyeron en el "equipo de campaña" del Senado que abogará por el voto a favor de las tres enmiendas a la Constitución; ayer comenzaron su campaña con una rueda de prensa.

El grupo está integrado por el presidente senatorial, Roberto Rexach Benítez, el portavoz de la mayoría popular en el Senado, Charlie Rodríguez, Kenneth McClintock y Sergio Peña Clós, quien se declaró senador "independiente" luego de ser reelecto bajo la insignia del Partido Popular.

Rexach Benítez indicó que posiblemente el vicepresidente del Cuerpo, Nicolás Nogueras, forme parte del grupo y explicó que McClintock, quien se casa hoy, se integrará en agosto.

Según explicaron en una rueda de prensa en el Capitolio, el equipo hará visitas pueblo por pueblo, participará en tertulias, charlas y salones y utilizará la prensa, la radio y la televisión para llevar el mensaje a favor de enmendar la Constitución. Rodríguez estuvo ausente de la rueda de prensa de ayer.

"Estamos ya prácticamente en campaña, desde el día de hoy", dijo Rexach Benítez.

Las propuestas que irán a votación el próximo 6 de noviembre serían la eliminación del derecho absoluto a la fianza, la limitación de los términos electivos y el aumento al número de jueces en el Tribunal Supremo.

Los senadores subrayaron que enfatizarán en la última, que elevaría de siete a nueve los miembros del Supremo. "Es el tema que más

se presta a confusión", dijo Rexach Benítez.

EL GRUPO no ha sido bautizado con ningún nombre pero Rexach Benítez, al hacer la introducción a la rueda de prensa, dijo que se habían reunido para hacer un equipo de campaña en el Senado.

Según Rexach Benítez, los fondos que utilizarán serán recaudados por él mismo. "El Partido Nuevo Progresista no va a aportar dinero para esto", manifestó. "No vamos a usar recursos económicos del PNP para sufragar nuestras actividades". Peña Clós, por su parte, defendió su participación en el grupo integrado mayormente por estadistas y dijo que "esto es una campaña cívica".

El Senador, quien prestó su voto al PNP para que se pudiera aprobar en el Senado la tercera enmienda constitucional, sostuvo que el otro era una enmienda y dijo que el 1986 redactó un proyecto para eliminar el derecho a la fianza a los criminales habituales.

El voto de Peña Clós, unido al de 19 novoprogresistas dio a la mayoría parlamentaria el mínimo de votos requerido para aprobar una Resolución de enmienda constitucional.

Seis senadores populares y el independentista Rubén Berríos votaron en contra de la pieza. El Partido Independentista, además de oponerse a las tres enmiendas, propuso ayer que se veden los anuncios que no sean esenciales del Gobierno en el periodo preelectoral.

EL "EQUIPO de campaña del Senado" rechazó esta última propuesta. "De lo que se trata aquí no es de buscar votos para un partido o un candidato o una obra de gobierno", dijo Rexach Benítez.

ANEJO 13

# Referendo

EL VOCERO, San Juan —Martes 12 de Julio de 1994

LCDO. HECTOR LUIS ACEVEDO
Responde críticas de 'Cucusa'

## Presidente PPD dice votarán favor unas propuestas, rechazarán otras

**The Associated Press**

El presidente del Partido Popular Democrático (PPD), Héctor Luis Acevedo, dijo el lunes que su partido votará a favor de unas propuestas y en contra de otras en el propuesto referéndum del 6 de noviembre próximo. Señaló que la Junta de Gobierno del PPD dejó a los populares que voten "a su conciencia" por la propuesta limitación al derecho a la fianza porque hay, "puntos a favor y en contra" sobre este tema.

Además, el también Alcalde de San Juan dijo que votarán en contra de la propuesta para aumentar de 7 a 9 el número de jueces del Tribunal Supremo por ser "un asalto a la Rama Judicial". Opinó que la Constitución de Puerto Rico es un documento que no debe "estar cambiando a gusto de los gobernadores". Ahora Rosselló quiere cambiarlo a 9 y después puede venir otro gobernador y querer aumentarlo a 4 más, dio como ejemplo Acevedo al rechazar la propuesta de aumento en los jueces del Supremo.

En relación al tercer tema del referéndum, que es para limitar los términos para los cargos electivos de gobernador, senador, representante y alcalde, Acevedo comentó que es un buen tema y el PPD lo respaldará. Cuando son ideas buenas las respaldamos, pero cuando hay que combatir una propuesta ahí estaremos, expresó durante un aparte con periodistas luego de cam-

biarle el nombre a la Calle 18 en Barrio Obrero en Santurce, con el nombre del cantante Tito Rodríguez.

**Refuta críticas de 'Cucusa'**

Por otro lado, Acevedo refutó las expresiones de censura hechas en su contra por la presidenta de la Cámara de Representantes y candidata a la Alcaldía de la Capital por el PNP, Zaida Hernández Torres. Esta lo acusó de "abandonar" el municipio de San Juan por sus constantes viajes al exterior, particularmente porque en lo que va de este año, ha hecho 24 viajes fuera del país que le han costado al Erario $37 mil.

Yo tengo que estar donde tengo que estar. Hoy estoy aquí en Barrio Obrero. Este jueves estaré en Washington y el viernes en Newark, defendiendo las propuestas contra la violencia, dijo Acevedo. El dirigente acusó a Hernández Torres de ser la persona que "no se le ha visto por San Juan". Preocupación tiene que tener ella porque nunca se le ha visto por San Juan. No ha hecho propuestas de legislación para San Juan, afirmó Acevedo.

Según el Presidente del PPD, a los líderes del PNP les hubiese gustado que no hubiese ido a Washington a defender la Sección 936 del Código de Rentas Internas del Departamento del Tesoro de Estados Unidos, que concede beneficios contributivos a las industrias norteamericanas en Puerto Rico.

# 'Movilización contra límite fianza'

El senador popular Eudaldo Báez Galib anunció el lunes la creación de un organismo electoral con miras al próximo referéndum de noviembre, que se conocerá como "Movilización Civil", a la que podrán acudir los electores que se opongan a que se enmiende la Constitución para derogar el derecho absoluto a la fianza.

**EUDALDO BAEZ GALIB**
Anuncia organismo

Movilización Civil estará registrada en el Departamento de Estado y la Comisión Estatal de Elecciones (CEE) y su propósito principal será ofrecer su sede a los organismos no partidistas que se opongan a la eliminación del derecho a la fianza. Tendrá observadores en todas las unidades electorales el día del referéndum en representación de estas entidades. Además, servirá como núcleo de intercambio y coordinación electoral, dijo Báez Galib en conferencia de Prensa en el Capitolio.

El legislador del Partido Popular Democrático (PPD) argumentó que son muchos los sectores del país que están en proceso de consolidarse para votar en contra de la medida que se presentará en el referéndum del 6 de noviembre, pero que no poseen la estructura electoral para viabilizar las gestiones en contra de la enmienda constitucional. Explicó que al PPD dejar en manos de sus miembros la decisión de apoyar o rechazar la enmienda, queda un sector desprovisto de apoyo electoral en contra de la derogación del derecho absoluto a la fianza.

En el referéndum de noviembre, los electores votarán sobre si apoyan o no que se elimine el derecho absoluto a la fianza; que se limiten los cargos electivos y que se eleve el número de jueces en el Tribunal Supremo. El PPD ha señalado que sólo hará campaña en contra de que se aumente el número de jueces al más alto foro judicial en el país.

"Me consta que existe una fuerte oposición a la eliminación de ese derecho por parte del sector laboral, organizaciones profesionales y culturales y por importantísimos núcleos religiosos, que entienden que la eliminación del derecho a la fianza es mucho más profundo que lo planteado y afecta los valores éticos y morales de la sociedad, incluyendo el mismísimo derecho a la libertad, la vida y su disfrute', dijo el legislador.

El Senador sostuvo que se siente obligado a crear este organismo porque comparte las preocupaciones de esas organizaciones y porque debe poner al servicio de esos sectores los conocimientos electorales que adquirió como Comisionado del PPD y por las conversaciones que ha sostenido con el liderato de ese sector.

"Puerto Rico está ante el primer intento en su historia de limitación de derechos y facultades, por lo que todo ciudadano que cree en la integridad de la Constitución y en los derechos allí consignados para proteger la vida y la libertad, vienen moralmente obligados a participar en contra", reiteró Báez Galib.

EL NUEVO DIA-SABADO 16 DE JULIO DE 1994

**3**

## Termina la luna de miel

Los presidentes de las Cámaras Legislativas no se hablan. Son vecinos, sus oficinas están localizadas en el mismo piso, a unos pies de distancia, pero están "enchismados". La reforma judicial y otros asuntos, los dejó enojados. Roberto Rexach Benítez le dijo a la Prensa que el teléfono de su oficina "está ahí, si quiere llamar (la Presidenta de la Cámara)", pues Hernández Torres ni se inmuta. La situación ha hecho crisis con el proyecto que crea una nueva ley de adopción. La medida de la autoría de Hernández Torres está siendo mutilada en el Senado por recomendación de miembros del Ejecutivo y de la Comisión de lo Jurídico, que preside Oreste Ramos. El

 

Rexach    Hernández

sentido lógico dice que habiendo un tranque con una medida tan importante, los presidentes deben ponerse de acuerdo, ya sea para rechazarla, enmendarla o aprobarla. Ni eso, y es que la situación es más profunda de lo que muchos comentan por los pasillos del Capitolio.

## Respuesta a medias

El representante Pedro Figueroa, presidente de la Comisión de Gobierno de la Cámara de Representantes, le envió una carta el siete de este mes a Mercedes Bauermeister, solicitándole, entre otros asuntos, el promedio de tiempo que tarda el Tribunal Supremo en la solución de casos, según las categorías de los mismos. La carta dirigida a Bauermeister, directora de la Administración de los Tribunales, fue contestada en el día de ayer con toda la estadística que solicitó Figueroa, pero con la salvedad de que no se incluyó el pedido antes mencionado. "Ella lo obvió porque aparentemente el Juez Presidente José A. Andreu García le tiene pánico a esas estadísticas que confirman la lentitud exagerada del Tribunal Supremo en la solución de casos", dijo Figueroa ayer en la tarde. El representante novoprogresista pidió la relación de casos presentados en todos los tribunales desde 1952 y Bauermeister la ofreció. Pero le pidió una relación estadística de los casos atendidos por los jueces del Supremo en los últimos diez años y el promedio de tiempo que tarda el Supremo en atender todos los casos que se le someten, algo que parece ser más sencillo, y ni lo mencionó en su carta ni en los documentos que presentó. "No me lo quiso certificar. Si pudo someter estadísticas más complejas, por que no pudo someter una estadística más sencilla, que es el promedio de tiempo que tarda el

# entre líneas

Supremo en despachar o resolver los casos y recursos que traen ante su consideración", cuestionó Figueroa. "Nosotros vamos a hacer nuestro propio análisis", concluyó.

## Más acción en los peajes

El Departamento de Transportación y Obras Públicas anunció que ampliará los servicios que ofrece en varias de las plazas de peaje para acelerar el tráfico vehicular y reducir las congestiones durante los fines de semana largos. La medida permitirá la operación de dos carriles de cambio hasta la 1:00 a.m. en la plaza de peaje de Caguas Sur en dirección hacia San Juan; y tres en la de Salinas entre 3:30 p.m. y 8:30 p.m. los domingos y lunes. También el DTOP autorizó a los operadores de los carriles atendidos a depositar la tarifa de peaje al efectuar el cambio solicitado por los conductores. La Autoridad de Carreteras y Transportación destacó empleados en la plaza de peaje de Toa Baja para exhortar a los ciudadanos a depositar con rapidez el pago en un intento por agilizar el flujo vehicular. También autorizó a los operarios del peaje a depositar las monedas correspondientes cuando los conductores pidan cambio en las horas y la dirección de mayor demanda, y mantendrá además dos carriles atendidos en cada dirección de viernes a domingo y lunes feriados hasta la 1:00 a.m. ¡Si ahora hay tapón, nadie puede decir que es por falta de brazos!

Abren más carriles en los peajes los "fines de semanas largos".

*The San Juan Star — Sunday, July 24, 1994*

## VIEWPOINT

# Judicial reform issue worth a vote

Chief Justice José A. Andreu García holds a press conference in April at the Condado Plaza.

**JORGE LUIS MEDINA**
*Commentary*

> Andreu dragged the court even lower when he began sounding and acting like a politician in his campaign to oppose a judicial reform.

¿Por qué no le preguntan al pueblo si quiere que la limitación de términos aplique inmediatamente a los que hoy ocupamos cargos electivos?

**ANIBAL ACEVEDO VILA**

# PERSPECTIVA ■55

EL NUEVO DIA · MARTES 26 DE JULIO DE 1994

## Otro error fundamental

La Constitución del Estado Libre Asociado recoge y reafirma las aspiraciones democráticas individuales y colectivas de los puertorriqueños. Esa Constitución del ELA, adoptada en 1952 con el apoyo inclusivo de partidos y sectores que se oponían al ELA como ideal política, goza hoy día de un apoyo tan amplio que inclusive el partido de la estadidad la ha propuesto como documento constitucional bajo una eventual estadidad federada.

La fuerza y vigencia de nuestra Constitución emana, en gran medida, del esfuerzo que se realizó al momento de adoptarla para que ésta fuese el producto del consenso de amplios sectores del País, lográndose inclusive, el apoyo decidido de personas como don Luis Ferré. Cualquier proceso dirigido a sedicarla o enmendarla, si no reconoce el valor unificador y directivo de raíz colectiva del País, está encaminado al fracaso y repudio del pueblo.

En su interés de darle más poder al... el gobernador Roselló nos ha invocado a otro evento electoral, (el ano en cuatro años), en esta ocasión es enmendar tres áreas fundamentales de nuestra Constitución, aumentando, nativamente, "que el sabio decide", Roselló ha decidido removerlo como fuerza ejecutoria del proceso de enmiendas institucionales. Independientemente a las ventajas o desventajas de cada una las propuestas enmiendas, algo de lo se habíamos en extremo durante la campaña, veamos si de verdad son sólidas para darle poder, o como Roselló se "empowerment", al pueblo.

Hay un reclamo de amplios sectores del País para que se limite inmediatamente el tiempo que los políticos pueden mantener en cargos electivos. A esos sectores hay que advertirles que la mente de Roselló para limitar los ternos no aplica a ninguno de los que y ocupamos cargos políticos. Cualquier legislador o alcalde que esté ocupando posición ahora podrá mantenerse ahí.

aún con la enmienda constitucional, hasta el año 2006, año en el que entonces podrá optar por cambiar de cargo, aspirar y mantenerse nuevamente por 12 años más. Si de verdad se trata de que el pueblo decida, ¿por qué no le preguntan al pueblo si quiere que la limitación de términos aplique inmediatamente a los que hoy ocupamos cargos electivos? ¿Por qué no le preguntan al pueblo si está de acuerdo en que un político, por ejemplo, después de 12 años de representante, puede servir 12 más como senador y luego 12 más como alcalde?

La enmienda a la fianza pretende quitarle derechos al pueblo y constituye otro engaño. En momentos en que ante la lentitud del caso Monserrate el País perciba nuevamente que el gobierno tiene otra vara cuando investiga a gente poderosa e influyente, se le va a pedir al pueblo que entregue uno de los derechos que tiene para protegerse de posibles injusticias. Todos sabemos que a quienes les van a negar el derecho a la fianza es a los pobres, que no tienen con qué pagar un abogado. Nuevamente, la retórica esconde la realidad. Lo que nos proponen es que entreguemos uno de nuestros derechos a cambio de nada.

Finalmente, el 6 de noviembre, bajo el pretexto de que el pueblo decida, Roselló intentará dar el golpe de gracia en su intento por apoderarse de la Rama Judicial. Nuestra Constitución dispone ahora mismo que el número de jueces del Tribunal Supremo podrá variarse, si lo propone el Gobernador. En palabras sencillas, para variar la composición del Tribunal Supremo se exige el consenso de los tres poderes constitucionales. ¿Qué mayor garantía que ésta puede haber de que el número de jueces responde al consenso más amplio posible?

Ese esquema constitucional ha dado la flexibilidad para que el número de jueces en el Tribunal Supremo haya variado varias veces, por consenso y sin atentar contra la independencia judicial. Si la teoría es que sea el pueblo el que decida, ¿por qué no permitirle al pueblo que escoja entre 5, 7, 4, 11 ó 13 jueces? ¿Por qué no permitirle al pueblo que sea el que decida si quiera la ley de Reforma Judicial de Roselló, que elimina los jueces de distrito, crea nuevos jueces para que el PNP los nombre y complica el sistema de justicia?

Como verán, prevalece en el actual gobierno una tendencia a frenar

elementos de ventajería política en áreas en que nuestra Constitución exige consenso y armonía. Tiene el actual Gobernador la visión de que el proceso de enmiendas constitucionales debe responder a las agendas políticas del gobierno de turno, sujeto a los caprichos, vaivenes y cambios de las mayorías momentáneas. En lugar de cobijar nuevas áreas de consenso en el documento constitucional, se pretende ahora utilizar el proceso político-electoral para destruir y menoscabar áreas en las cuales ya habíamos logrado alcanzar el consenso. Estamos definitivamente ante un retroceso histórico en el pensamiento de los gobernantes en Puerto Rico.

No estoy planteando que nuestra Constitución es un documento inerte que no se puede enmendar. La propia Constitución dispone el proceso para enmendarla, dos terceras partes de Cámara y Senado, y la mayoría del pueblo en las urnas. Ese proceso, complicado, costoso y difícil de alcanzar, garantiza que los cambios que se le introduzcan a la Constitución, al igual que ocurrió al momento de su aprobación, emanen de un consenso de amplios sectores del País. El error fundamental que está cometiendo el gobernador Roselló es pensar que porque tiene mayoría momentánea de dos terceras partes en la Legislatura, tiene licencia para plasmar sus visiones políticas inmediatas en las generaciones futuras. Eso es contundir lo que es el verdadero poder del pueblo. Ese error, lo llevó a la derrota en el plebiscito de noviembre del año pasado.

El verdadero poder del pueblo está en garantizarse que tiene una judicatura independiente. El verdadero poder del pueblo está en respetar la Constitución del ELA como documento de consenso del pueblo. El verdadero "empowerment" está en ampliar, no eliminar o limitar, los requisitos de consenso para trastocar nuestra Constitución. Todo esto lo pone en riesgo Roselló y con ello atenta contra la Constitución del ELA, como documento de unidad y armonía del pueblo.

ANEJO 18

## GARCIA SAN INOCENCIO

Comoquiera qué se examinen las tres propuestas de enmienda constitucional de Rosselló no tienen pies, ni cabeza

# PERSPECTIVA ■39

EL NUEVO DIA - LUNES 18 DE JULIO DE 1994

## Tres "No" a Rosselló

D. D. V.

En el plebiscito de diciembre pasado el liderato estadista capituleando por el gobernador Rosselló sufrió una derrota significativa. El momentum político generado por las victorias electorales del PNP de 1991 y 1992 se desinchó en cuestión de horas. No sólo la estadidad salió maltrecha en ese plebiscito. La teoría menoseada del mandato, el mito de la indemostrabilidad de Rosselló y los aires de un tercer Reich perspecta salieron trasquilados.

El efecto de esa derrota política y sicológica fue mucho más fuerte de lo que evaluamos originalmente. En el ámbito ideológico la estadidad ha pasado a ser una palabra casi prohibida en el léxico oficial estadista. En materia de administración pública se le ha dado rienda suelta a un betalismo descomunal para tratar de apoyar a una maquinaria partidista frustrada. Mientras que en materia de proyección pública la administración Rosselló ha sucumbido a la tentación de gobernar por las imágenes ya que no puede gobernar al país.

"Menos 'Goschel' es un reflejo de... acción publicitaria de este gobierno. Se ha tratado de mantener una presencia pública a billetazos y a fuerza de una manipulación desgarradora de la información gubernamental. Sin embargo, todo ese montaje no ha sido eficaz para contar la mancha que entre ceja y ceja corta al PNP desde su derrota plebecitaria de diciembre pasado. El iderato perspecta tiene una necesidad imperiosa de exorpara ese tumor alguico. Para ello se han inventado el referéndum sobre tres enmiendas constitucionales.

De la esperanza vive el cautivo. El "goacheriato" aspira a que un clavo saque el otro. Que la mancha de diciembre de 1993 sea lavada con un ilusorio "triunfo" en las urnas en noviembre del 1994.

Las tres propuestas de enmienda a la Constitución tienen de común un diseño enauco, un propósito que cuando no escapa, es seguimiento y un tenenfoque colosal de las verdaderas rondades de nuestro pueblo en materia de cambios en la estructura de gobierno.

Lo que sucede es que los diseñadores de la estrategia "matolín" para lavarse la derrota del año pasado no tomaron en cuenta qué propuestas de cambio a la Constitución eran importantes, sino cuáles previsiblemente podrían resultar simpáticas en su conjunto. Se equivocaron terriblemente en su selección y van camino -otra vez- de una segunda derrota electoral en fines.

Veamos:

● La propuesta para limitar los términos a cargos electivos - Se intenta presentar esta enmienda como algo grandioso. En teoría nadie podrá ser electo alcalde, representante o senador por más de tres términos. Tampoco nadie podrá ser electo gobernador por más de dos términos ¿Suena bien, verdad?

Falso. La norma sería de carácter prospectivo. Es decir, valdría del 1997 para adelante. Eso quiere decir que si el pueblo se equivoca y estuviese dispuesto a elegir un mal alcalde o legislador ese persona podría todavía ser reelecta por doce años para el cargo. Esto significa que a ese mal alcalde, por ejemplo, podría reelegirse hasta el año 2008 ¡Cuatro años después de las Borinqueñas, al que se dan! Pero no para ahí. En el año 2008 este alcalde maruseloñico podría ser electo doce años más como representante y doce años más como senador y siga sumando.

Esta propuesta no limita nada, es un aguaje, un cambio en pura teoría, otra imagen. Otra "goacheriada" que para dorar la píldora incluye una limitación de dos términos al cargo de Gobernador. Si le generocidad era tanta y "el afán de cambio" tan grande, por qué no limitar a un solo término de incumbencia al cargo de Gobernador. De otra parte, ¿quién en el PNP ha sido Gobernador ya dos veces y lucía mal si tratara de aspirar de nuevo? Era evidente la dirección de ese dardo para resolver pugnas internas del PNP cuando surgió la idea programática hace más de dos años.

● La propuesta para limitar el derecho a la fianza - Se plantea esto como una "solución adicional" para lidiar con la alta incidencia delictiva. Tienen un solo problema. Nadie ha podido demostrar que las personas fadas son un ingrediente en la espiral de la criminalidad. Más aun, varios estudios coinciden en que tal ascenso podría estar relacionado con la salida prematura para reducir el hacinamiento -sentencias acordadas- de miles de convictos en los pasados años. Mientras se suelta a culpables comprobados, se quiere encerrar sin fianza a personas que esperan por un juicio.

Por otro lado, la campaña oficialista anuncia que "la criminalidad" está bajando. Si el alegación es correcta, ¿para qué inquietarse con la Carta de Derechos y con el derecho a la fianza?

Queda claro que con esta enmienda no se solucionaría nada y que emprenderíamos el deslizamiento por la cuesta resbalosa de quitarle derechos fundamentales a todos los puertorriqueños. Se cree de la mata que si esa limitación no funcione vendrá algún hechino a proponer que se elimine la prohibición contra registros y allanamientos irrazonables y otros iterazos afines Hay que parar en seco este afán de renunciar derechos básicos que amparan a los puertorriqueños de hoy y a los que están por nacer.

● La propuesta de aumentar y fijar a nueve el número de jueces del Tribunal Supremo - Esta es otra de las prioridades detectadas por los incansables sabeadores del gobierno de la imagen. Los proponentes han intentado dar como trastoque de la separación de poderes. Son tan contradictorias algunas de esas explicaciones que ameritan un artículo separado.

La única razón -no todos los proponentes se atreven a expresarla públicamente por bochorno- es la de promover un alegado balance ideológico. Es decir, creen prudente nombrar juez del Tribunal Supremo a alguien principalmente porque sea de la ideología del partido de gobierno. Quieren nombrar dos jueces azules el más año foro judicial puertorriqueño.

Intentan justificar esta conducta vandálica a base de una supuesta lentitud del Tribunal Supremo para resolver los casos. Sin embargo, se estrellan contra las estadísticas del 6tmo año y contra el propio circuito gigante apelativo que acaban de crear que previsiblemente reduciría segundas apelaciones al Tribunal Supremo.

-Aducen además, que como el Supremo tendrá ahora que ver apelaciones de casos de filtración de facto, acotas a sobreprecio por anuncios engañosos y letreros removidos por AIPE, entre otros, entonces estarán repletos los calendarios y necesitarán esos otros dos jueces. Han lamado a este dictale la teoría del plomero con el esquito de camarero. Este llega a casa del cliente, verla cemento en las tuberías y justifica que se le contrate para destaparlas o cambiarlas.

Comoquiera que se examinen las tres propuestas de enmienda constitucional de Rosselló no tienen pies, ni cabeza, ilustran las prioridades desenfocadas de este gobierno, y obedecen a las intenciones que hemos explicado. Por ello le diremos "NO" con nuestros votos en el referéndum de noviembre.

El autor es asesor del PNP en la Cámara de Representantes.

ANEJO 19

**SEVERO COLBERG TORO**

El Tribunal Supremo no
puede ser tratado como un
balón político cifuentesco
como se creen en Fortaleza
y en la Legislatura

# 66 — PERSPECTIVA —

EL NUEVO DIA · SABADO 23 DE JULIO DE 1994

## El asalto a la rama judicial

a agenda del Partido Nuevo Progresista y la consecución de su ideal, la estadidad federada, para la isla, obligan al Gobierno de Rosselló, Cifuentes y Goechet a destruir todas aquellas instituciones puertorriqueñas que por su naturaleza y función se perciben como obstáculos en el camino hacia la asimilación. Así podemos constatarlo con la derogación de la Ley del Español como idioma Oficial, la eliminación de la Oficina de Puerto Rico en Nueva York, la lucha en contra del magisterio de la isla, la persecución política en las agencias públicas y recientemente con el ataque a la prensa mediante el nefasto "Goechetazo". Todo esto para que el camino que intenta el P.N.P. que recorra el pueblo puertorriqueño sea dirigido para que culminemos todos en la gran falacia de la estadidad federada. No es más que un nuevo pero inútil intento de levantar ascua la más hipócrita gratificación y glorificación de la dependencia y la negación de nuestra etnia colectiva como p...

...se visto en estos últimos días que la próxima instalación en la mira del PNP es el Honorable Tribunal Supremo de Puerto Rico y la Rama Judicial a todos los niveles. Se ha presentado una Resolución Concurrente para someter una enmienda a la Constitución en el Referéndum que se celebrará durante este año a los fines de aumentar de siete a nueve el número de los Jueces del Tribunal Supremo de Puerto Rico. Y con una gran ingenuidad o cinismo indican que quieren hacerlo para que este Foro tenga "un balance ideológico", como si el impartir justicia fuera un asunto de ideología y no de hacer justicia. Los que sustentan esta posición demuestran no tener altura de miras, ni convicción profunda en sus ideales.

Desde los albores mismos de nuestra Constitución se consagra el principio de independencia judicial que tiene, por obligación, ser parte integral de nuestras armas hermanas de gobierno. No se

mero verbo inarticulado al principio constitucional que provee para que todo el aparato gubernamental de Puerto Rico se constituya a través de la forma republicana de gobierno consistente en tres ramas constitucionales independientes y soberanas cada una en su respectivo escenario de acción. El socavar la pureza del mecanismo constitucional establecido para enseñar la composición del Tribunal Supremo con ulteriores propósitos político-partidistas significa a todas luces que la administración gubernamental no respeta, ni conoce la deferencia debida a instituciones y postulados que nos definen como un pueblo auténticamente democrático y celoso de la sociedad civilista en que convivimos.

Es penoso ver cómo en el sagrado foro legislativo se deben medidas de trascendental impacto para nuestro país en que la mayoría parlamentaria puede articular argumentos de valía que sustenten el afán de cambio que permea a la presente administración rosellista. El cambio en sí mismo no puede constituirse en un fin inmisericorde que arrastre nuestras tradiciones y nuestras instituciones y postulados empedrándose en un mandato abstracto que pretende legitimar lo ilegal.

No se nos puede escapar el apuntar que el tan cacareado "mandato del pueblo" no es un cheque en blanco a girarse en contra de todos los pilares que constituyen la sociedad puertorriqueña. Bajo esa teoría y con una campaña de engaño al Pueblo podría dar un mandato a que volviéramos a un régimen esclavista, monárquico o "apartheid". Nada más absurdo y lejos de la verdad social. Nunca hablamos visto una hemorragia tan indiscriminada de leyes, órdenes ejecutivas y directrices destinadas a desacreditar el estado legítimo que nos ampara a todos los puertorriqueños por encima de aquellas nimiedades o pequeñeces que nos dividen.

En el caso de la composición del Tribunal Supremo y la propuesta enmienda constitucional es un ejemplo de lo que hemos señalado, el intento de destrucción de instituciones democráticas puertorriqueñas. El propuesto aumento a un número mayor de jueces crea problemas prácticos que han llevado a nuestro Tribunal Supremo y como a tribunales supremos de otras jurisdicciones, a oponerse a aumentar su composición. Solamente en ocho cortes supremas estatales de los Estados Unidos existen nueve jueces. En veinticinco estados de los Estados Unidos las cortes supremas tienen siete jueces y en diecinueve estados solamente cinco jueces. La Asociación

Americana de Abogados recomienda que el número de jueces en la Corte Suprema de los Estados sea siete jueces.

Más aún, debe señalarse que en Puerto Rico la experiencia con un Tribunal Supremo de nueve jueces se analizó de 1965 a 1971 y ésta no fue satisfactoria a evaluación misma de los jueces del Tribunal Supremo. Sobre un tribunal supremo de nueve miembros, el American Bar Association afirmó que el aumento en el número de jueces también aumenta las posibilidades de debate, decrepencia y discordia que podrían obstaculizar la eficiencia, la efectividad y la rapidez en la solución de los casos ante el Tribunal.

Esta Resolución Concurrencia del Senador y la Cámara presentada por los señores Rexach, McClintock, Figueroa, Hernández, Granados, Nicolás y los demás cofirmos es otro testimonio de un gobierno al garete y el ataque a todas las instituciones puertorriqueñas. El Tribunal Supremo no es un acordeón que se expande y se contrae a voluntad de los líderes politiqueros del PNP. El Tribunal Supremo no puede ser tratado como un balón político cifuentesco como se creen en La Fortaleza y ahora en la Legislatura.

Esperamos con paciencia y prudencia que este nefasto capítulo de imitaciones llegue a su final con consecuencias perjudiciales mayores para el pueblo y para la justicia. Defendamos con esfuerzo genuino a Puerto Rico del asalto a la Rama Judicial y corrigiendo el tamaño error provocado por la ineptitud gubernamental rosellista, de forma y manera que volvamos a poner la casa en orden. Es por estas razones que tenemos todos los puertorriqueños que amamos nuestras instituciones democráticas la obligación moral de combatir esta propuesta de enmienda constitucional Defendamos la Constitución votándole no al plan Rosselló.

El autor es representante por el PPD

ANEJO 20

# A campaña educativa referendo

5 EL VOCERO, San Juan — Miércoles 27 de Julio de 1994

Por Luis R. Varela
The Associated Press

PONCE — La Directora Ejecutiva de la Administración de los Tribunales, Mercedes Marrero de Bauermeister, dijo el martes que realizará una campaña educativa de la Ley Habilitadora del Referéndum que, entre otras cosas, propone aumentar de 7 a 9 los jueces del Tribunal Supremo.

"Me propone llevar un mensaje educativo serio al pueblo, para que, simplemente, se planteen los datos y los efectos que vemos en esto de tratar de aumentar el número de jueces del Supremo", dijo la funcionaria en Ponce. "Claro, no vamos a entrar en banderías políticas sobre este tema, porque creo que en estos momentos eso no es necesario", agregó.

La Directora Ejecutiva de la AT opinó que no se justifica este proyectado aumento en el número de jueces, ni por la población del país, ni por el volumen de trabajo de los jueces y denunció que dirigentes gubernamentales "están manipulando estadísticas" acerca de este asunto.

Marrero de Bauermeister se unió a la posición del Presidente de la Asociación Puertorriqueña de la Judicatura, el juez superior Pierre Vivoni, quien anunció que los jueces realizarán en la Isla una campaña destinada a orientar al pueblo para que vote en contra de esta medida en el referéndum del próximo 6 de noviembre. Marrero de Bauermeister dijo que lo que se necesita, en la actualidad, es aumentar los fondos que se asignan a la Administración de Tribunales para contratar oficiales jurídicos y otro personal. Dijo que es "insuficiente" la asignación de $2 millones que contempla la administración del gobernador Pedro Rosselló para poner en práctica la Reforma Judicial tal y como la concibe.

Dirigentes del gobierno alegan que se aligerarían los procesos en el Tribunal Supremo de asignarse dos jueces adicionales. Marrero de Bauermeister opinó que eso no es correcto.

MERCEDES M. DE BAUERMEISTER
Directora Adm. Tribunales

ANEJO 21

## en la nación

Referéndum 6 de noviembre

# Campaña educativa para orientar al pueblo

*"Es un desconocimiento total decir que nueve jueces van a resolver más rápido que siete porque se trata de un tribunal colegiado donde todos los casos pasan a la consideración de todos.", dijo Vivoni.*

### Vivoni está en su derecho

El Presidente de la Comisión de Ética del Colegio de Abogados, manifestó que Vivoni estaba en su perfecto derecho de discutir el asunto como cara catedrático abierta dentro del campo especializado a la Rama Judicial y en serio de la Independencia judicial.

No obstante, Amán hizo la salvedad de que Vivoni no debía estar en el Colegio político o identificar cuando desemboca esta comienda constitucional.

Añadió Amán explicó que se esperaba se encerrara el asunto, porque la Comisión del Colegio de Abogados que presta ella no ha tomado una posición.

Siempre subdividió en la prensa está que se diluían judicial en su esto tipo de discusión en lo que el Ejecutivo estaba favor algo que afecta la Rama Judicial Asimismo, dijo que lo tenía pensó que la jueces hacen la opinión del público sobre esto.

"Este asán no se habla discutir, Vivoni hecho nada y no encontró ningún asán que haciera esto ver eso así, no hay un precedente sobre esto.", señaló Amán.

Por Sara Del Valle
CLARIDAD

El Presidente de la Asociación Puertorriqueña de la Judicatura se encuentra en la etapa de diseño de una campaña educativa para orientar al pueblo sobre lo equivocado de votar a favor de un aumento de jueces para el Tribunal Supremo en el referéndum a celebrarse el próximo 6 de noviembre.

En entrevista telefónica con CLARIDAD, el juez Pedro E. Vivoni indicó que el momento se ha mantenido trabajando en el diseño de una campaña educativa, no política, para concienciar al pueblo en lo equivocado de tomar una decisión de esta naturaleza en el referéndum.

"Esta campaña conlleva la comparecencia a distintos foros cívicos como también educativos. La idea es poder llevar el mensaje del impacto que tiene una comienda constitucional de esta naturaleza y que el enfoque que se le ha tratado de dar no es el correcto.", señaló Vivoni.

Añadió el letrado que esta comienda priva al Supremo del derecho a decidir y señalar cuáles son sus propias necesidades.

"Cuando se discutió esto en la Convención Constituyente, el principal opositor de una disposición o de la disposición que quería incorporarse en esos momentos fue Jaime Benítez", recordó al juez.

Indicó que Benítez decía que el aumento de los jueces debía estar regulado de antemano y que debía estar en manos del pueblo ratificar o no ratificar ese aumento.

"Es más o menos la posición de Rosselló aunque por distintas razones. Rosselló lo que quiere es nombrar dos jueces.", explicó Vivoni.

Continuó contando que el principal opositor a este asunto del aumento de jueces fue el exgobernador del Partido Nuevo Progresista Luis A. Ferré.

Según explicó Vivoni, Ferré decía que la judicatura "debía estar totalmente libre de intervención política, particularmente el Tribunal Supremo, y que no debía haber injerencia alguna de los partidos" para poder variar el número de su composición.

El Presidente de la Asociación de la Judicatura manifestó que decir que nueve jueces resolverían los casos más su consideración más rápidamente que siete es erróneo.

"Es un desconocimiento total el decir que nueve jueces van a resolver más rápido que siete porque se trata de un tribunal colegiado donde todos los casos pasan a la consideración de todos.", dijo.

El aumentar el número de jueces a 9 significaría, según el juez, que dos jueces más tendría que ver los casos que llegan al Supremo por lo que sería imposible que los mismos salieran más rápidamente del Tribunal.

Para Vivoni, las actuales reglas de juego le dan potestad al Primer Ejecutivo para nombrar jueces al Tribunal Supremo si hay vacantes disponibles, pero no le autoriza a crear vacantes, lo que podría ser la verdadera intención del Gobernador.

"Alterar este orden, es alterar el principio de separación de poderes. Esto es un intento obvio del ejecutivo de querer controlar o tener una influencia mayor sobre la Rama Judicial que con las reglas actuales no tiene.", apuntó el juez.

En cuanto al asunto de las Esupra, que también será llevado ante la consideración del pueblo en el referéndum, la Asociación no hará campaña en este punto en particular "pero siempre se va a tocar".

La posición de la Asociación Puertorriqueña de la Judicatura, explicó Vivoni, es que el eliminar el derecho absoluto a fianza no es un castigo, no permite obtener el adecuado balance con relación a la presencia de violencia y es totalmente innecesario para poder lograr los propósitos que se señalan en la disposición de motivos del proyecto.

Asimismo, el juez señaló que aprobar una comienda de esta naturaleza significaría un atraso en la lucha por los derechos civiles.

El otro punto que se tocará en el referéndum, el de las limitaciones a los términos electivos en el gobierno, es un engaño, indicó Vivoni.

"Dicen que hay que dejar al pueblo que decida en términos de la composición de la Rama Judicial. Sin embargo, la otra comienda le dice, pueblo tú puedes decidir, pero no

puedes decidir en cuanto a cuántas veces tú quieres elegir a un funcionario. Solamente 3 si es legislador o alcalde y 2 si es gobernador.", manifestó Vivoni.

El magistrado declaró que lo que se pretende con la consulta del aumento de jueces y la de los términos electivos "es un contrasentido".

Este otro asunto será tocado en las discusiones que realizará la Asociación pero no ocupará la importancia central de las mismas.

En cuanto a las críticas que se le han hecho por tomar la batuta para defender la independencia judicial, Vivoni puntualizó que las esperaba.

"Esperaba las críticas, pero los jueces estamos acostumbrados a tomar decisiones. Cada vez que yo resuelvo un caso alguien piensa que yo soy el mejor juez del mundo y otro piensa que soy el peor.", concluyó.

4     CLARIDAD - Del 29 de julio al 4 de agosto de 1994

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

El Tribunal —por voz de su entonces Juez Presidente, el Lcdo. José Trías Monge— inequívocamente, y en forma unánime, dictaminó, en *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 85–86 (1980), que el asunto de si "debe o no enmendarse la Constitución del Estado Libre Asociado para limitar el *derecho a fianza* ... es una *controversia de índole política* sobre la que este Tribunal *no* puede pronunciarse". (Énfasis suplido.)

Si ello es así, demás está decir que una consulta a la ciudadanía sobre si se debe, o no, limitar a dos (2) términos la elección del Gobernador, los legisladores y los alcaldes, en Puerto Rico, o si se debe, o no, aumentar el número de los Jueces de este Tribunal, *es, igualmente, una controversia de índole política sobre la cual tampoco tenemos la autoridad para expresarnos.*

Sorprendidos, y atribulados, ante la resolución que hoy emite una mayoría de los integrantes del Tribunal, nos cuestionamos: ¿cómo es posible que, si el *propio* Tribunal Supremo de Puerto Rico carece de autoridad para expresarse sobre una cuestión política, este Tribunal tenga autoridad para concederle "permiso" a los jueces del Tribunal de Primera Instancia para que lleven a efecto una *campaña* al respecto? Sobre todo, cuando consideramos que dichos jueces de instancia se estarán expresando sobre una cuestión que, de manera principalísima, le atañe al Tribunal Supremo.

El viraje, o cambio radical en la posición, del Tribunal en este asunto no sólo resulta violatorio de la Sec. 12 del Art. V de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, pág. 361, la cual expresamente prohíbe la participación de un miembro de la judicatura puertorriqueña "en campañas políticas de

clase alguna", sino que infringe, de manera frontal, las disposiciones del Canon XIII de Ética Judicial, 4 L.P.R.A. Ap. IV-A, el cual prohíbe, en lo pertinente, no sólo que un juez del tribunal de primera instancia haga "expresiones, comentarios o manifestaciones públicas sobre asuntos o actos de naturaleza política o partidista" sino que éste entable "polémicas con candidatos o líderes políticos". Íd.

Esto es, la citada disposición constitucional y el mencionado canon de ética judicial *no* se circunscriben meramente a prohibir —como erróneamente se asevera en la resolución mayoritaria— la participación de jueces en las *campañas* políticas que se llevan a cabo en nuestro País con el propósito de elegir candidatos a puestos electivos políticos. Las hasta hoy "sagradas" disposiciones prohíben, de manera absoluta, la participación de los jueces en *campañas* relativas a *todo* asunto de índole político.

¿Quién se atreve a negar que la consulta, o referéndum, que la Asamblea Legislativa ha pautado para el próximo 6 de noviembre de 1994 efectivamente versa sobre un asunto político partidista?; consulta sobre la cual los tres (3) partidos políticos principales del País ya se encuentran en pugna y públicamente han anunciado que dilucidarán la misma ante la ciudadanía mediante una campaña publicitaria enérgica y vigorosa. El "permiso" hoy concedido a los jueces de instancia *trasciende* la emisión de una aislada expresión que sobre un asunto que concierne y afecta a la Rama Judicial pueda hacer un miembro de la judicatura puertorriqueña, en defensa de la misma, en determinado momento. *La autorización hoy concedida va mucho más lejos.* El Tribunal le permite a los jueces de instancia *no sólo participar activamente en la campaña política que se avecina sino que les autoriza a llevar a cabo su propia campaña.*

La imagen, o visión, de unos jueces *sistemáticamente* dictando charlas, o emitiendo discursos, "en foros idóneos",

contestando y haciendo imputaciones, y envueltos en dimes y diretes no sólo con los políticos del País sino que con sus propios compañeros de estrado, *ciertamente no es la imagen o idea que tenemos del noble integrante de la Judicatura puertorriqueña.* Por la posición privilegiada que ocupan los miembros de la Judicatura en la sociedad puertorriqueña, la opinión que éstos públicamente manifiesten, *sobre un asunto político,* puede indebidamente influenciar el criterio que puedan tener los ciudadanos de este País respecto al asunto en controversia. Por otro lado, la participación de jueces en una *campaña* política tiene el efecto, *indeseable y trágico,* de desmerecer y lesionar la imagen del juez en la comunidad en que ejerce su delicado ministerio ya que dicha participación puede causar divisiones, y enconos, no sólo entre la ciudadanía y la Judicatura sino que entre los propios integrantes de la Rama Judicial.

Hace algunas semanas, al disentir de una Opinión emitida por la mayoría de los integrantes del Tribunal, *nos cuestionamos qué nos depararía el futuro. Debemos confesarlo. Jamás pensamos en que llegaría a esto.*